TEXTRON INC., Acting By and Through its HOMELITE DIVISION, Plaintiff,

v.

BARBER–COLMAN COMPANY, Burlington Industries, Inc., A.B. Carter, Inc., Hoechst Celanese Corporation, and Dixie Yarns, Inc., Defendants.

No. 3:93–CV–411–P.

United States District Court, W.D. North Carolina, Charlotte Division.

Oct. 4, 1995.

Christopher G. Browning, Jr., Hunton & Williams, Raleigh, NC, Richard C. Belthoff, Jr., Grier and Grier, P.A., Charlotte, NC, Joseph C. Kearfott, Hunton & Williams, Richmond, VA, for Textron, Inc., Acting by and Through its Homelite Division.

Benne C. Hutson, Irving M. Brenner, Smith, Helms, Mulliss & Moore, Charlotte, NC, for Barber–Colman Company.

Robert W. Fuller, III, Robinson, Bradshaw & Hinson, Charlotte, NC, for Burlington Industries, Inc.

Stephen R. Berlin, Petree Stockton, Winston–Salem, NC, J. Stephen Shi, Petree Stockton, Winston–Salem, NC, for A.B. Carter, Inc.

Thomas N. Griffin, III, Kevin A. Dunlap, Parker, Poe, Adams & Bernstein, Charlotte, NC, for Hoechst Celanese.

Bradford A. De Vore, Womble, Carlyle, Sandridge & Rice, Charlotte, NC, for Parkdale Mills, Inc.

Amos C. Dawson, III, Maupin Taylor Ellis & Adams, Raleigh, NC, Hugh J. Moore, Jr., Witt, Gaither & Whitaker, P.C., Chattanooga, TN, for Dixie Yarns, Inc.

### MEMORANDUM OF DECISION AND ORDER

ROBERT D. POTTER, Senior District Judge.

**THIS MATTER** is before the Court on Motion by Defendant Dixie Yarns, Inc. ("Dixie") for Summary Judgment, filed December 16, 1994 (document # 78). For the reasons stated herein, that motion will be granted.

An investigation by the United States Environmental Protection Agency ("EPA") and the North Carolina Division of Solid Waste Management ("DSW") confirmed the presence and threatened release of hazardous substances at the so-called "Harwell Road site." That investigation also indicated that Textron Inc. ("Textron") was a principal generator of those hazardous wastes. As a result, the EPA issued an administrative order, pursuant to Section 106 of CERCLA, 42 U.S.C. § 9606, that required Textron to remove the hazardous substances from the site. Textron voluntarily complied with the EPA's order. Later, Textron filed this contribution action to recover some of those costs from the Defendants in this action.

### I. BACKGROUND.

In the late 1940's, R.A. McKee began doing business in Gastonia, North Carolina. His business was waste disposal. In connection with that business, he purchased the 10.5 acre property that abuts Harwell and Beatty Roads in 1967. He used that property to dispose of waste picked up from his custom-

ers, and that property is now referred to as the Harwell Road site.[1]

McKee did business with a number of industrial companies in Gaston County. He both constructed and maintained septic systems and removed sludge from their tanks. At some companies his practice was to dispose of the sludge removed from their tanks on their own property. With respect to other companies, however, he removed waste from their holding and treatment tanks by pumping sludge from those tanks into his tanker truck. He then transported that sludge and wastewater to the Harwell Road site and disposed of the waste there. The Harwell Road site was permitted for the disposal of sludge by the Gaston County Health Department.

McKee began using the Harwell Road property to dispose of septic sludge as soon as he purchased it in 1967. His practice was to dig trenches in the ground approximately 30″ wide by 6′ deep and anywhere from 12″ to 20′ long. He disposed of sludge by emptying his 2000 gallon tank truck into those trenches, allowing the sludge and wastewater to seep into the ground. Later, McKee would cover the sludges with dirt. McKee conducted his operations this way until about 1978 when he sold his business.

Ultimately, an investigation by the EPA and the North Carolina DSW indicated the presence and threatened release of hazardous substances at the Harwell Road site. That investigation also indicated that Textron was a principal generator of those hazardous wastes. Therefore, in 1989 Textron received an administrative order from the EPA, later revised in May of 1990, pursuant to § 106(a) of CERCLA, 42 U.S.C. § 9606(a). The revised order stated that the migration of hazardous substances from the site constituted an actual or threatened release as defined in Section 101(22) of CERCLA. The order required Textron to remove the hazardous substances from the Harwell Road site as well as conducting other operations designed to render the site safe.

Textron elected to voluntarily comply with the EPA's order. It thereafter performed a variety of tasks including the installation of monitoring wells, hydraulic conductivity testing, metal detector surveys, as well as the sampling and analysis of soils, surface water, groundwater and septic pits. Pursuant to the EPA's order, Textron also excavated, removed, sampled, and disposed of buried drums and their contents off-site, and performed other work required by the EPA. By virtue of the EPA's investigation and Textron's activities many hazardous substances have been detected at the Harwell Road site including zinc, copper, phenol, the BTEX compounds (benzene, toluene, ethylbenzene and xylene), and a variety of other heavy metals, and volatile and semivolatile compounds.

Later, Textron filed this action to recover some of the costs incurred to comply with the EPA's order from the Defendants in this action. According to Textron, the Defendants also generated some of the hazardous substances found at the Harwell Road site, and therefore, they are liable for some share of the costs Textron incurred to remove those wastes as well as any future costs incurred by Textron to comply with EPA mandates.

All of the Defendants have moved for summary judgment. In large part, the motions for summary judgment before the Court arise from the passage of time. McKee hauled waste generated by his customers to the Harwell Road site between 1967 and 1978 and he was 85 years old at the time of his deposition on May 19, 1994. Although he had kept the books for his business, those records were destroyed in a fire that occurred around 1979 or 1980. So he is the only source of information concerning his waste-hauling business. Similarly, the passage of time has limited the documentary and other evidence about the Defendants' operations available through discovery. Textron's efforts to discover the chemicals used in connection with the Defendants' processes of production has met with little results. Thus, the documentary evidence upon which Textron relies is fairly slim. And ultimately, it is this sparsity of evidence that drives all of the

---

1. Like the parties, the Court refers to the Harwell Road site as such; but in his deposition testimo-ny McKee refers to the property as the Beatty Road site.

motions for summary judgment now before the Court. In one way or another, all of the Defendants assert that Textron has failed to produce evidence from which a reasonable person could conclude that their processes of production generated hazardous substances and/or that those hazardous substances were hauled by McKee to the Harwell Road site.

## II. ANALYSIS.

In this case, Textron seeks contribution from the Defendants for their proportionate share of response costs etc. incurred by Textron in connection with its remediation of the Harwell Road site. As previously noted by this Court, according to the plain language of § 113 of CERCLA, 42 U.S.C. § 9613(f)(1), Textron's contribution action in this case arise under § 107 of CERCLA, 42 U.S.C. § 9607. That section imposes strict liability on certain classes of persons described therein, and does not require any showing that the specific hazardous wastes generated by a given defendant caused the release of hazardous substances that results in remedial action. *U.S. v. Monsanto Co.*, 858 F.2d 160, 167–68 (4th Cir.1988). Liability under CERCLA is joint and several unless a defendant can show that damages are divisible. *See e.g. Monsanto*, 858 F.2d at 171 & n. 3; *U.S. v. Alcan Aluminum Corp.*, 964 F.2d 252, 267–71 (3rd Cir.1992) (discussing cases).

Taken together § 9613(f)(1) and § 9613(g)(3) confirm that Textron has a right to contribution from the Defendants if it can show that the Defendants are liable for response costs etc. under § 9607. In pertinent part that section provides:

### § 9607

#### (a) Covered persons; scope

\* \* \* \* \* \*

(3) any person who by contract, agreement, or otherwise arranged for disposal ... of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances, shall be liable for

\* \* \* \* \* \*

(b) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

42 U.S.C. § 9607(a). In this case, Textron must show that the Defendants arranged with McKee for the disposal of wastes containing hazardous substances, and those wastes are at the Harwell Road site.

The Defendants have moved for summary judgment pursuant to Fed.R.Civ.Proc. 56, alleging that Textron has failed to produce evidence from which a reasonable person could conclude that any Defendant generated hazardous substances that were disposed of at the Harwell Road site. "Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) *citing* Fed.R.Civ.Proc. 56(c). However, Rule 56 does not require the moving party to produce evidence negating an opponent's claim. *Celotex Corp. v. Catrett*, 477 U.S. at 323, 106 S.Ct. at 2553. That is, "under *Celotex*, 'the moving party on a summary judgment motion need not produce evidence, but simply can argue that there is an absence of evidence by which the nonmovant can prove his case.'" *Cray Communications v. Novatel Cmptr. Systems, Inc.*, 33 F.3d 390, 393–94 (4th Cir.1994) (*citing* 10A Wright, Miller & Kane, *Federal Practice and Procedure* § 2720 at 10). This is because "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses ..." *Celotex*, 477 U.S. at 323–24, 106 S.Ct. at 2553.

"Once a defendant makes a properly supported motion for summary judgment, the burden shifts to the plaintiff to set forth specific facts showing that there is a genuine issue for trial." *Sylvia Development Corp. v. Calvert County, Md.*, 48 F.3d 810, 817 (4th Cir.1995) *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "[T]here is no issue for trial unless there is sufficient evidence

favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* at 249, 106 S.Ct. at 2511. Put another way, there must be a *genuine* issue for trial. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* at 251, 106 S.Ct. at 2512. "The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict ..." *Id.* Where, as here, a party moves for summary judgment based on lack of proof as to material facts, "the judge must ask himself ... whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson,* at 251, 106 S.Ct. at 2512.

■ As with any summary judgment motion, "the court must draw any permissible inference from the underlying facts established in the record in the light most favorable to the non-moving party." *Austin v. Clark Equipment Co.,* 48 F.3d 833, 835 (4th Cir.1995). But in order for an inference to be *permissible* it must be *reasonable,* and "[w]hether an inference is reasonable cannot be decided in a vacuum; it must be considered in 'light of the competing inferences' to the contrary." *Sylvia,* 48 F.3d at 818, *citing Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). As the Fourth Circuit has stated:

> [I]t is the province of the jury to resolve conflicting inferences from circumstantial evidence. Permissible inferences must still be within the range of reasonable probability, however, and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture.

*Sylvia,* 48 F.3d at 818 *citing Ford Motor Co. v. McDavid,* 259 F.2d 261, 266 (4th Cir.1958) (brackets in original). In short, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than

simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

■ In this case, Textron has relied heavily on the testimony of its expert and the Defendants have also albeit to a lesser extent. The admissibility of expert testimony in federal court is governed by Fed.R.Evid. 702. That rule provides:

> If *scientific, technical, or other specialized knowledge* will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702. Recently, in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court explained that portion of the rule relating to expert "knowledge" by stating, "the word 'knowledge' connotes more than subjective belief or unsupported speculation. The term applies to any body of known facts or any body of ideas inferred from such facts or accepted as truths on good grounds." *Id.* at ——, 113 S.Ct. at 2795. Under the Federal Rules, the trial judge must ensure that any and all expert testimony is not only relevant but also reliable. *Daubert,* at ——, 113 S.Ct. at 2786. Further, not every opinion offered by an expert is an expert opinion. Rule 702 "does not afford the expert unlimited license to testify ... without first relating that testimony to some 'specialized knowledge' on the expert's part...." *U.S. v. Johnson,* 54 F.3d 1150, 1157 (4th Cir.1995). Put another way, an expert's opinion "must be an 'expert' opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert." *U.S. v. Benson,* 941 F.2d 598, 604 (7th Cir.1991).

■ The Fourth Circuit has recognized that on a motion for summary judgment, the court's screening role under Fed.R.Civ.Proc. 56, dovetails with the court's "gatekeeper" function as to expert testimony, *see Daubert,* —— U.S. at ——–——, 113 S.Ct. at 2798–99, and "[t]he credibility of competing experts is

a question for the jury only if the party with the burden of proof has offered enough evidence to sustain a verdict in its favor." *Alevromagiros v. Hechinger Co.,* 993 F.2d 417, 421 (4th Cir.1993). And just as "[a]n expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record." *Tyger Const. Co. Inc. v. Pensacola Const. Co.,* 29 F.3d 137, 142 (4th Cir.1994), summary judgment should be granted where expert opinion suggests merely a possibility, as opposed to a probability, "precisely to guard against raw speculation by the fact-finder." *Sakaria v. Trans World Airlines,* 8 F.3d 164, 172–73 (4th Cir.1993). The Fourth Circuit has indicated that an expert's subjective opinion is insufficient to withstand a motion for summary judgment because "we are unprepared to agree that 'it is so if an expert says it is so.'" *Alevromagiros,* 993 F.2d at 421 (citations omitted); *see also Daubert,* —— U.S. at ——, 113 S.Ct. at 2795 (expert knowledge must be more than subjective belief or unsupported speculation). Thus, the inferences a court is asked to draw by expert testimony must be reasonable in light of competing inferences. *See Comprehensive Technologies v. Software Artisans,* 3 F.3d 730, 737 (4th Cir.1993); *see also Anderson,* 477 U.S. at 251, 106 S.Ct. at 2512 (standard for summary judgment and directed verdict are the same).

Seen in this light, it is apparent that the experts of both parties are woefully overextended. *Cf. Hardin v. Ski Venture, Inc.,* 50 F.3d 1291, 1296 (4th Cir.1995) (regarding plaintiff's effort to "stretch the expert's testimony beyond its set boundaries.") The vast majority of the "expert" testimony offered to the Court concerns nothing more than inferences to be drawn from the record, or some arguably lay opinion testimony based on experience that is not "expert" in any meaningful sense. Not only have these "experts" testified as to ordinary inferences to be drawn from the evidence of record, some experts have seen fit to opine as to the meaning of CERCLA provisions. In fact, the amount of testimony as to which the expertise of the parties' experts is truly relevant is remarkably slim—almost non-existent.

Dixie has moved for summary judgment asserting that Textron has failed to produce evidence from which a reasonable person could conclude that it generated hazardous substances that were disposed of at the Harwell Road site. The evidence shows that Dixie and its predecessors operated three plants in North Carolina that are implicated by Textron's contribution action, the Myers, Pickney, and Ridge plants. All three of these mills spun thread and yarn during the period when McKee used the Harwell Road site to dispose of wastewaters that he extracted from the wastewater treatment systems of his customers. Dixie was one of McKee's customers, and Textron alleges that these wastewaters contained BTEX compounds and unidentified household hazardous wastes from houses in Dixie's "mill village."

### A. BTEX in the Meon.

Both McKee and Odell Hullett, a retired Dixie employee, testified that McKee removed spent Meon from Dixie's Ridge plant. Meon was used in the wet twisting process at the Ridge mill. Meon was mixed in a "Meon tank" located behind the mill. Yarn was directed around a roller through Meon contained in a trough where the yarn became soaked. The Meon was recirculated (after lint was filtered out) until it was "spent," and spent Meon was picked up by McKee who disposed of the Meon at the Harwell Road site. According to McKee, he picked up Meon from the Ridge plant about four or five times, and each load ranged between 750 to 1,200 gallons. The Ridge plant was the only facility where Meon was used.

In his original report, Koon emphasized that Meon had a kerosene base, and therefore contained BTEX chemicals that are listed hazardous substance under CERCLA. Subsequently, Dixie asserted that the BTEX came within CERCLA's petroleum exclusion because it came from Meon's kerosene base, and kerosene was a fraction of petroleum. Koon then submitted a rebuttal report in which he offered his opinion that Meon is not petroleum within the meaning of CERCLA. In that report Koon described again the process whereby Meon is manufactured. He stated:

After [the process whereby Meon was derived from kerosene], ethylene glycol or diethylene glycol was added to form the final product. Ethylene glycol is a hazardous substance under CERCLA.

By its own terms, Koon's affidavit is insufficient to withstand a motion for summary judgment. Koon testifies that one of two chemicals was added to Meon and notes that one of those two chemicals is a hazardous substance under CERCLA. But Meon has not been manufactured for decades and Koon has no idea whether the Meon used in Dixie's plant contained ethylene glycol. Thus his opinion is the very type of conjecture that is insufficient to withstand a motion for summary judgment. *See Sakaria,* 8 F.3d at 172–73 (summary judgment should be granted where expert opinion suggests merely a possibility, as opposed to a probability, "precisely to guard against raw speculation by the fact-finder.") *See e.g. Tyger Const. Co. Inc.,* 29 F.3d at 142 ("[a]n expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record.") *see also, Dana Corp. v. American Standard, Inc.,* 866 F.Supp. 1481, 1498 (N.D.Ind.1994) ("[T]here must be evidence beyond a witness effectively saying 'anything's possible', because such evidence is not sufficient to support a finding.") Also, as Dixie has pointed out, there is no evidence that ethylene glycol is at the Harwell Road site. The Court need not, and does not, find this fact, but merely notes that it tends to confirm what seems obvious: Koon's assertion that the Meon contained ethylene glycol is mere conjecture.

▬▬ Textron also argues that Meon is a petrochemical that is not within the petroleum exclusion. But Textron's whole claim, except for the belated assertion that Meon contained ethylene glycol, was that Meon is a

hazardous substance because it contains BTEX. In this regard, Textron's expert asserted that the BTEX in Meon came from its kerosene base. He has also admitted that kerosene is a fraction of petroleum. Thus, the kerosene is within the plain meaning of the petroleum exclusion which, in pertinent part, excludes from the definition of hazardous substance "petroleum, including crude oil or any fraction thereof." 42 U.S.C. § 9601(14), and as noted above, there is no concrete evidence that the Meon contained any hazardous substance except the BTEX contained in its kerosene base. The Court believes that merely adding non-hazardous additives to substances within the petroleum exclusion, such as kerosene, does not bring those substances outside the petroleum exclusion, unless the additives themselves are hazardous substances or increase the level of hazardous substances already in the kerosene, or the union creates a new compound that is, in itself, a hazardous substance. *Cf. Southern Pacific Transp. Co. v. California (Caltrans),* 790 F.Supp. 983, 984–87 (C.D.Cal. 1991) (Union of oil and a non-hazardous substance produces a non-hazardous substance); *U.S. v. Alcan Aluminum Corp.,* 964 F.2d 252, 266–67 (3rd Cir.1992). (oil infused with hazardous substances is outside the exclusion, but oil not infused with hazardous substances is within the exclusion). In this case, Textron merely alleges that the Meon contained BTEX from its kerosene base. Therefore, the Meon is within the petroleum exclusion and it is not a hazardous substance under CERCLA.[2]

## B. *BTEX in the Varsol.*

▬▬ Textron alleges that the wastewaters generated by Dixie's plants and disposed of at the Harwell Road site contained BTEX. In support of this assertion Textron notes

---

**2.** Textron claims that the Varsol and Meon were "wastes" and as such they fall outside of CERCLA's petroleum exclusion. The Court finds no basis for this distinction in the language of the statute, and it defies common sense to assert that CERCLA's petroleum exclusion, an exclusion from a statute designed to address releases of hazardous substances into the environment, is limited to virgin petroleum or fractions thereof. As other courts have noted, Congress has taken great care to distinguish regulations governing

wastes from hazardous substances, *see B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192 (2nd Cir.1992), and under these circumstances, the Court sees no warrant for concluding that substances within CERCLA's petroleum exclusion fall outside that exclusion merely because they are wastes. *See also* Al Smith, *CERCLA's Petroleum Exclusion: An Endangered Species,* BNA Environmental Reporter, Jan. 20, 1995, pp. 1811–1815.

that Varsol, a mineral spirit containing BTEX, was used at each of Dixie's plants. In addition, Koon is prepared to testify that in his experience during the period when McKee was using the Harwell Road site it was the custom in industry to dispose of Varsol by pouring it down the nearest sink or toilet. According to Koon, if Varsol was poured down the sink or toilet and it went through the wastewater tank, then its BTEX components would be adsorbed into the sludge of the wastewater tank. Of course, as noted earlier, BTEX chemicals biodegrade fairly rapidly, so his opinion is contingent; in his report he stated that if McKee pumped out the wastewater tank "soon" after the Varsol was poured into the system, then McKee would have taken BTEX from the various tanks and disposed of them at the site. In his deposition, Koon conceded that the time it would take for the BTEX to degrade would depend upon the amount and the frequency that BTEX entered the system.

However, the only evidence concerning the disposal of Varsol at the Myers, Ridge, and Pickney plants indicates that Dixie had a standard procedure whereby Varsol was dumped on coal piles that were burned to produce energy for the plants or dumped on the plant grounds. This testimony was provided by Hubert Hannah who worked for Dixie from 1951–1992. Hannah also noted that some workers might have thrown Varsol down the storm drain system at the plants, but he did not know of any disposal of Varsol in sinks or toilets, and he thought that would have gotten someone fired.

The Court agrees with Dixie that Textron has failed to produce evidence from which a reasonable person could conclude that any waste hauled by McKee contained BTEX from Varsol poured down sinks and toilets by Dixie's employees. For one thing, Koon's generalizations concerning any typical disposal of Varsol is insufficient to create a genuine issue of material fact with respect to Dixie's disposal practices. This general opinion about disposal practices that might possibly have been employed at Dixie's plant is not the specific evidence needed to withstand summary judgment. *See Sakaria,* 8 F.3d at

172–73 (summary judgment should be granted where expert opinion suggests merely a possibility, as opposed to a probability, "precisely to guard against raw speculation by the fact-finder."); *Alevromagiros,* 993 F.2d at 421 ("[t]he credibility of competing experts is a question for the jury only if the party with the burden of proof has offered enough evidence to sustain a verdict in its favor."). Further, Koon has not and indeed cannot contradict the testimony establishing that Dixie's standard procedures called for burning waste Varsol, or dumping it on company property. Given this undisputed evidence, Textron cannot rely on Koon's testimony as to some generalized custom in the industry to rebut the specific evidence of Dixie's disposal practices. The inference Koon asks this Court to draw is unreasonable in light of competing inferences. *See Comprehensive Technologies,* 3 F.3d at 737 (The inferences a court is asked to draw by expert testimony must be reasonable in light of competing inferences). Realizing this, Textron and its experts are reduced to asserting that somebody must have poured Varsol down a sink or toilet. But the Court has already observed that this sort of conjecture is simply not sufficient to withstand a motion for summary judgment. *See e.g. Tyger Const. Co. Inc.,* 29 F.3d at 142 ("[a]n expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record.") *see also, Dana Corp. v. American Standard, Inc.,* 866 F.Supp. 1481, 1498 (N.D.Ind.1994) ("[T]here must be evidence beyond a witness effectively saying 'anything's possible', because such evidence is not sufficient to support a finding.")

Further, even if the Court assumed that some Varsol was poured down Dixie's sinks or toilets, the Court would also have to infer that Dixie's employees introduced Varsol into its wastewaters in amounts and with the frequency necessary to ensure that McKee picked up the wastewater soon after the Varsol was introduced such that it had not biodegraded. As Koon admitted in his testimony, he has no way of knowing whether Dixie employees dumped Varsol down sinks or toilets and how much they might have dumped. Nor does Koon know how long any Varsol

would have remained in any of Dixie's systems before McKee picked up wastewater and sludge, and therefore he cannot know whether any waste that might have been dumped would have biodegraded before McKee arrived. Under these circumstances, any inference that waste McKee hauled contained BTEX from Varsol is mere speculation.

## C. *Household Hazardous Wastes.*

As noted, the evidence shows that the Myers plant wastewater system received wastewater from approximately 40–50 homes, and the Ridge plant wastewater system received wastewater from approximately 30–40 homes. According to Textron, the wastewater discharge generated by these households contained hazardous substances that entered the wastewater systems at these plants, adsorbed into the sludge. Once again, Koon is the source of Textron's claim. Relying on a few recent studies concerning hazardous substances present in the waste of households sampled in a few studies, Koon asserts that he can opine as to the amount and kind of household hazardous waste that was generated by the households in Dixie's mill villages.

 Under the Federal Rules, the trial judge must ensure that any and all expert testimony is not only relevant but also reliable. *Daubert,* —— U.S. at ——, 113 S.Ct. at 2786. "[I]n order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation, *i.e.,* 'good grounds' based on what is known." *Id.* at ——, 113 S.Ct. at 2795. A court confronted with a proffer of expert testimony must determine whether an expert is proposing to testify as to (1) scientific knowledge that will (2) assist the trier of fact, and "[t]his entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether the reasoning or methodology properly can be applied to the

facts in issue." *Id.* at ——, 113 S.Ct. at 2796. Among the factors relevant to determining whether a proffer consists of "scientific" knowledge are (1) whether the theory or technique has been tested, (2) whether it has been subject to publication and peer review, (3) the known or potential rate of error, and (4) general acceptance in the community. *Id.* at ——, 113 S.Ct. at 2797. In addition, Rule 702 requires the Court to determine whether the proffered testimony will be "helpful to the trier of fact" a condition that "goes primarily to relevance." *Id.* at ——, 113 S.Ct. at 2795. Here a court must ask whether the proffered testimony is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id.* at ——, 113 S.Ct. at 2796 (*citing U.S. v. Downing,* 753 F.2d 1224, 1242 (3rd Cir.1985)).

 For two principal reasons, the Court finds that Koon's opinion on these matters is not sufficient to create a genuine issue of material fact. First, the Court finds that Koon's opinion does not qualify as "scientific knowledge" under the test enunciated in *Daubert.* For example, some of the studies relied upon by Koon concern household *solid* waste and Koon admitted in his deposition that these studies did not have any significant connection with hazardous substances present in household *liquid* waste of the kind that was treated *via* Dixie's system. Also, several of the studies caution that they should not be used as a basis for further extrapolation absent further study. For example, one study forthrightly states:

> There is very little knowledge about the presence of HHW [Household hazardous waste] in the residential wastestream.... None of the quantification projects could be considered statistically valid.

*A Survey of Household Hazardous Wastes and Related Collection Programs,* pp. 1–2, United States Environmental Protection Agency, Office of Solid Waste and Emergency Response, Washington, D.C., 1986.[3] Other studies relied on by Koon have similar *caveats* which caution the reader from extra-

---

**3.** In its brief, Textron attempts to minimize the effect of this disclaimer by noting that it comes from a study concerning solid waste which is "the least significant to Dr. Koon." The Court agrees that the applicability of these studies is insignificant but notes that Dr. Koon did rely on them.

polating from the data contained therein. For example, an EPA study of hazardous substances in household wastewater states "Only a careful consumer product survey could adequately determine the amount of the chemicals used in the home." *Sources of Toxic Compounds in Household Wastewater,* United States Environmental Protection Agency, Municipal Environmental Research Lab., Cincinnati, OH, August 1980, p. 3. These cautions indicate that this body of literature has not reached the point where experts are willing to venture the sort of broad conclusions Koon has essayed in this case and do no more than confirm common sense: absent a high degree of statistical certainty, general studies cannot be used to draw conclusions in specific cases. The very studies relied upon by Koon indicate that they do not provide the statistical certainty that would arguably make them a reliable basis for testimony in this regard.

Also, the Court finds that studies relied upon by Koon, and therefore, his opinion in this matter, are not sufficiently tied to the facts of this case. The earliest study relied upon by Koon is dated 1980. That study cautions, "Obviously, not all of these compounds will be found in household wastewater since a number of factors come into play such as changes in product usage within individual homes and even entire communities ... Only a careful consumer product survey could adequately determine the amount of the chemicals used in the home." *Sources of Toxic Compounds in Household Wastewater,* United States Environmental Protection Agency, Municipal Environmental Research Lab., Cincinnati, OH, August 1980. The remainder of the studies range from 1985–1993, p. 3. Koon has opined in conclusory terms that the households in Dixie's mill village were typical and comparable so that these studies can be used to describe the wastewater from these homes. Koon's statement in this regard is a naked assertion. The studies specifically describe the socio-economic circumstances of the neighborhoods sampled precisely because they affect test results. But Koon offers nothing by way of compari-

son that would equate the households connected to Dixie's wastewater systems with those sampled in the studies. Nor has he addressed whether the quantity or quality of household hazardous wastes entering wastestreams in 1980 and beyond are sufficiently similar to those available in the 1975 and 1976 to merit comparison. For the same reason, Textron cannot use a 1994 test of wastes generated by Dixie's mill village to any waste generated when McKee did his work. *Cf. Rogers v. Raymark Industries, Inc.,* 922 F.2d 1426, 1431–32 (9th Cir.1991) (Excluding evidence based on studies of asbestos dust in industrial plants to establish exposure in defendant's plant where there was no showing of sufficient similarity between defendant's plant and those studied.)

In the Court's view, these deficiencies in Koon's opinion, when taken together, indicate that his opinion that Dixie's waste contained household hazardous wastes is not sufficiently reliable to withstand a motion for summary judgment. The studies relied upon by Koon do not provide him with a reliable basis for general opinions about the quality or quantity of *typical* household wastewaters. As such, there is substantial room for error when such data is relied upon for extrapolation. Second, Koon's opinion is not sufficiently tied to the facts of this case because he has offered no basis for his opinion that the studies relied upon are sufficiently similar to the households connected to Dixie's wastewater system to merit comparison. Therefore, the Court finds that Koon's testimony is not sufficiently reliable to withstand a motion for summary judgment. *See Sakaria v. Trans World Airlines,* 8 F.3d 164, 172–73 (4th Cir.1993) (Summary judgment should be granted where expert opinion suggests merely a possibility, as opposed to a probability, "precisely to guard against raw speculation by the factfinder."); *Alevromagiros,* 993 F.2d at 421 ("we are unprepared to agree that 'it is so if an expert says it is so.'"); *see also Daubert,* —— U.S. at ——, 113 S.Ct. at 2795 (expert knowledge must be more than subjective belief or unsupported speculation).[4]

4. Because the Court finds that Textron has not produced the specific facts that would allow a

reasonable fact-finder to concluded that hazardous substances entered Dixie's wastewater sys-

Textron asserts that Dixie's wastewaters and sludge contained BTEX and unidentified household hazardous substances. But for the most part, Textron's claim rests on the largely unsupported assertions of its expert, Dr. Koon. Textron has failed to produce the specific concrete facts that would provide a basis for that opinion, and therefore, that opinion is insufficient to withstand Dixie's motion for summary judgment. Therefore, Dixie's motion for summary judgment will be granted.

**NOW, THEREFORE, IT IS ORDERED** that Defendant Dixie Yarns, Inc.'s Motion for Summary Judgment, filed December 16, 1994 (document # 78), be, and hereby is *GRANT-ED.* A judgment will be filed simultaneously with this Memorandum of Decision and Order.

tem, the Court need not address its contention that the BTEX contained in Meon and Varsol is outside of the petroleum exclusion because it mixed with other hazardous substances in Dixie's wastewater system.