**AETNA CASUALTY & SURETY CO., Plaintiff,**

v.

**DOW CHEMICAL CO., Defendant.**

No. 93–73601.

United States District Court,
E.D. Michigan,
Southern Division.

April 10, 1998.

---

Charles Browning, Detroit, MI, for Plaintiff..

Michael P. Foradas, Stephen P. Jeffirs, Kirkland & Ellis, Chicago, IL, for Defendant.

**MEMORANDUM OPINION AND ORDER (1) GRANTING FIREMAN'S FUND'S MOTION FOR PARTIAL SUMMARY BASED ON THE POLLUTION EXCLUSION; (2) GRANTING IN PART AND DENYING IN PART TRAVELERS/AETNA'S MOTION FOR PARTIAL SUMMARY JUDGMENT BASED ON THE POLLUTION EXCLUSION; (3) DENYING TRAVELERS/AETNA'S AND DOW'S CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT BASED ON THE LOSS–IN–PROGRESS DOCTRINE; (4) GRANTING IN PART AND DENYING IN PART TRAVELERS' MOTION FOR PARTIAL SUMMARY JUDGMENT BASED ON THE LACK OF PROPERTY DAMAGE; (5) GRANTING FIREMAN'S FUND'S MOTION AND DENYING DOW'S CROSS MOTION REGARDING CLAIMS AND SUITS WHERE DOW IS NOT A NAMED PARTY; AND (6) DENYING CENTURY'S MOTION FOR SUMMARY JUDGMENT REGARDING INDEMNIFICATION COVERAGE UNDER ITS ACCIDENT–BASED POLICIES**

EDMUNDS, District Judge.

This action arises out of an insurance contract dispute. Defendants Dow Chemical Company and Dow Corning, Inc. (collectively "Dow") have been the target of third-party and government-related environmental contamination claims asserting that Dow is responsible for damages, including clean-up costs for alleged contamination, at several hundred sites in the United States and Canada. Aetna Casualty & Surety Company is one of Dow's insurers. Aetna [1] filed this declaratory judgment action against Dow and 48 of Dow's primary and excess insurers requesting that the Court determine the rights and liabilities of the parties under Dow's various insurance policies for coverage as to these environmental claims.

Dow seeks indemnification coverage under a series of comprehensive general liability ("CGL") policies issued to it between 1944 and 1985. Although the language varies slightly, with the exception of Dow's earliest primary policy, the policies at issue provide indemnity coverage for all sums that Dow becomes legally obligated to pay as damages that result from property damage or bodily injury caused by an occurrence.[2] Dow began purchasing primary CGL policies in 1944, and it first purchased excess coverage in 1955.

In an effort to resolve this dispute efficiently, the parties and the Court have agreed to focus the litigation in the first instance on ten Final Sites: Brookhurst; Cliffs–Dow; Daffron & Pinion; Harris/Farley Street; Hartley & Hartley; Midland, Texas; Monahans, Texas; Petro Processors, Inc ("PPI"); Silresim; and Conalco. The Court has previously ruled that: (1) Michigan law applies to the insurance contracts in this case, 883 F.Supp. 1101; (2) the absolute pollution exclusion in Dow's post–1985 primary policies bars coverage for all claims at issue, 933 F.Supp. 675; (3) the "personal injury" coverage in Dow's policies does not afford coverage for trespass and nuisance claims, 933 F.Supp. at 680–81; (4) Dow's motion for summary judgment concerning the duty to defend would be granted in part and denied in part, 12/4/97 Mem. Op.; (5) the issue of Dow's right to reimbursement of pretender defense costs would be reserved for trial, 12/4/97 Mem. Op.; and (6) the issue of whether and how defense costs are to be allocated among the primary insurers would also be reserved, 12/4/97 Mem. Op.

This matter comes before the Court on the following motions for partial summary judgment: (1) Fireman's Fund's and Travelers/Aetna's motions as to the pollution exclusion; (2) Travelers/Aetna's and Dow's cross motions concerning the loss-in-progress doctrine; (3) Travelers/Aetna's motion regarding the lack of property damage; (4) Fireman's Fund's and Dow's cross motions regarding

---

**1.** Aetna currently identifies itself as Travelers Casualty and Surety Company f/k/a Aetna Casualty and Surety Company or as "Travelers CS." The Court refers to this insurer as Travelers/Aetna except when referring to policy periods that involve only one and not the other.

**2.** The 1944–1949 Century Indemnity policies provide indemnity coverage for damages caused by an accident. The scope of indemnity coverage under these policies is addressed below.

indemnification coverage where Dow is not a named party; and (5) Century's motion regarding indemnification coverage under its accident-based policies.

For the reasons stated below, this Court: (1) GRANTS Fireman's Fund's motion for partial summary judgment based on the pollution exclusion; (2) GRANTS IN PART AND DENIES IN PART Travelers/Aetna's motion for partial summary judgment based on the pollution exclusion; (3) DENIES Travelers/Aetna's and Dow's cross-motions for partial summary judgment based on the loss-in-progress doctrine; (4) GRANTS IN PART AND DENIES IN PART Travelers' motion for partial summary judgment based on the lack of property damage; (5) GRANTS Fireman's Fund's motion and DENIES Dow's cross motion for partial summary judgment regarding claims and suits where Dow is not a named party; and (6) DENIES Century's motion for summary judgment regarding indemnification coverage under its accident-based policies.

## I. Summary Judgment Standard

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). After adequate time for discovery and upon motion, Rule 56(c)

mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. 317, 323, 106 S.Ct. 2548. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505. The court must believe the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. 2505.

## II. Analysis

### A. Pollution Exclusions—Sudden and Accidental Exception

Fireman's Fund and Travelers/Aetna (collectively "Insurers") have filed motions for partial summary judgment arguing that there is no duty to indemnify Dow under their policies containing a pollution exclusion with an exception for "sudden and accidental" discharges, dispersals, releases or escapes.[3] A number of Excess Insurers have filed Joinders.[4]

---

**3.** The pollution exclusion language in Fireman's Fund's 7/30/70 policy (expiring 1/1/74) is substantially similar to that provided in its 1/1/74 policy (expiring 4/1/76) and is substantially similar to that provided in all the policies at issue here. The 7/30/70 policy language is as follows:

> It is agreed that the insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water, but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

7/30/70 policy, FF Ex. 1 at FF 001599.

**4.** Fireman's Fund's (7/30/70–4/1/76) motion has been joined by Centennial. Travelers/Aetna's (1972–1985) motion has been joined by the AIG Defendants (American Home Assurance Co., Insurance Co. of the State of Pennsylvania, and National Union Fire Insurance Co. of Pittsburgh, Pennsylvania), Certain Defendants (as identified in the Certain Defendants' Joinder), Centennial, First State, Interstate Fire and Casualty, Highlands Insurance Company, Home Insurance Co., Employers Insurance of Wausau, and the London Excess Insurers (as identified in the London Insurers' Joinder).

The London Excess Insurers argue that, although the language varies, and in some instances is different than that present in the Aetna policies, coverage is precluded. They also reserve the right to move separately for summary judgment at a later time if necessary based on

Fireman's Fund issued primary comprehensive general liability (CGL) policies to Dow covering the period from 11/19/56 through 4/1/76. The policies that were in effect from 7/30/70 to 4/1/76 contain a pollution exclusion with a sudden and accidental exception. Aetna (now Travelers CS) issued primary CGL policies to Dow covering the period from 4/1/76—4/1/85. Aetna also issued excess indemnity policies to Dow from 1972 through 1985. Each of these policies contains a pollution exclusion with a sudden and accidental exception. No primary policy issued to Dow prior to July 30, 1970 contained an exclusion for pollution-related claims. It was not included in the excess policies until March 31, 1971, as the London Excess Insurers concede.

Insurers argue that Dow cannot present evidence showing that the "sudden and accidental" exception to the pollution exclusion applies as to some or all of the ten Final Sites, and therefore, Dow is not entitled to indemnification coverage at those sites for the years their policies contained this pollution exclusion. Specifically, Fireman's Fund argues that the pollution exclusion in its policies for the years 7/30/70 to 4/1/76 bars Dow's claims at the Cliffs–Dow, Conalco, Daffron & Pinion, Silresim and Harris/Farley Street Final Sites. Aetna argues that the pollution exclusion in its primary and excess policies bars Dow's claims as to each of the ten Final Sites.

Dow does not dispute that it has the burden of establishing that the exception to the pollution exclusion applies. Dow also concedes that there were no sudden and accidental events at the Cliffs–Dow, Daffron & Pinion, and Conalco Sites and thus no indemnification coverage exists for the years the subject pollution exclusions were in effect as to these three Final Sites. Dow asserts, however, that Insurers are not entitled to summary judgment on their pollution exclusion motions as to the remaining seven Final Sites because it has established that genuine issues of material fact exist whether some of the damage at those Final Sites could be the

result of "sudden and accidental" discharges. Dow further asserts that: (1) under Michigan law, the proper focus for determining whether a discharge at a landfill is sudden and accidental is the discharge of pollutants from a landfill into the surrounding soil, groundwater and surface water, and not the initial placement of waste in the landfill; (2) Michigan law distinguishes between direct discharges into the environment without any expectation of containment and direct discharges where there is an expectation of containment; and (3) Michigan law recognizes that identifiable discharges can be separated from a larger pattern of discharges for application of the sudden and accidental exception to the pollution exclusion clause in an insurance policy. *See South Macomb Disposal Authority v. American Ins. Co.,* 225 Mich.App. 635, 572 N.W.2d 686 (1997).

Insurers argue that *South Macomb* was wrongly decided and further argue that, under Michigan law, the proper focus is on the initial discharge of pollutants or contaminants into the environment and, where a regular pattern of discharges has taken place, some evidence of discrete incidents of subsequent "sudden and accidental" releases is not enough to fall within the purview of the sudden and accidental exception to the pollution exclusion. Insurers further argue that, even if *South Macomb* correctly states Michigan law, Dow has not presented evidence showing that: (1) these events satisfy the Michigan Supreme Court's definition of "sudden and accidental"; and (2) these events caused the pollution in question.

### 1. Michigan Law

The proper standard of review to be applied here is that stated by the Sixth Circuit in *Employers Ins. of Wausau v. Petroleum Specialties, Inc.,* 69 F.3d 98, 103 (6th Cir. 1995); i.e., whether, drawing all justifiable inferences in its favor, Dow has presented evidence upon which a reasonable jury could find that some damage at the subject sites could be the result of "sudden and accidental" discharges, releases, dispersals, or es-

construction of specific, unique language in their pollution exclusion clauses.

capes as those terms have been defined under Michigan law.

### a. The Proper Focus is on the Release or Discharge From Landfill into the Environment

■ This Court finds the Michigan Court of Appeals' recent decision in *South Macomb* to be persuasive and controlling here. In *South Macomb*, the court held that the proper focus when applying the sudden and accidental exception to the pollution exclusion is on the discharge or release of contaminants from a landfill into the environment and not on the initial placement of waste in the landfill. This Court predicts that the Michigan Supreme Court will likewise find persuasive the *South Macomb* court's analysis and conclusions on this pollution exclusion issue. "[A]n intermediate appellate court's judgment that announces a rule of law is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." (internal quotes and citations omitted). *FL Aerospace v. Aetna Cas. & Sur. Co.*, 897 F.2d 214, 218–19 (6th Cir.1990), *cert. denied*, 498 U.S. 911, 111 S.Ct. 284, 112 L.Ed.2d 238 (1990). This prediction finds support in the Michigan Supreme Court's action on the appeal in *Kent County v. Home Ins. Co.*, 217 Mich.App. 250, 551 N.W.2d 424 (1996), *vacated in part and remanded in part*, 568 N.W.2d 671 (1997), where, in lieu of granting cross-appellant's application for leave to appeal, it vacated "that portion of the judgment of the Court of Appeals holding that the 'sudden and accidental' exception to the pollution exclusion clauses is not triggered here" and remanded "the matter to the trial court for a determination of whether the discharges that occurred *from the landfill into the environment* were 'sudden and accidental.'" 568 N.W.2d 671 (emphasis added).[5]

In *South Macomb*, the court clarified that when determining whether the sudden and accidental exception applies to discharges or releases at a landfill designed to contain contaminants placed in that landfill, the court: (1) focuses on the discharge or release of contaminants from the landfill into the environment and not on the mere disposal of wastes at the landfill; (2) may separate out isolated, identifiable discharges from an overall pattern of discharge; and (3) examines whether there is evidence supporting the insured's claim that these separate, isolated, identifiable discharges were "sudden and accidental" as those terms have been defined by the Michigan Supreme Court. The *South Macomb* court rejected the same arguments Insurers raise here and announced a rule that distinguishes between direct discharges into the environment without any expectation of containment; i.e., the discharge of pesticide into the atmosphere present in *Protective Nat'l Ins. Co. of Omaha v. City of Woodhaven*, 438 Mich. 154, 476 N.W.2d 374 (1991), and direct discharges where there is an expectation of containment; i.e., "in a landfill designed and licensed to contain waste" as present in *Kent County* and *South Macomb*. *South Macomb*, 225 Mich.App. 635, 572 N.W.2d 686, 698. Acknowledging that its prior holding in *Kent County* involved examination of an exception to the pollution exclusion with language different from the "sudden and accidental" language present in

---

5. In *Kent County*, the Michigan Court of Appeals held that (1) there was no need to address whether the proper focus for the sudden and accidental exception to the pollution exclusion was the initial placement of waste into the landfill or the subsequent discharge of contaminants into the soil or groundwater because there was no evidence of the required temporal element as to either the initial or subsequent discharge; and (2) "if waste materials are placed in a contained area or structure and later escape into the environment, the latter discharge is the relevant discharge." 217 Mich.App. at 263–64, 268, 551 N.W.2d at 430, 432–33.

The *Kent County* court distinguished the decisions in *Protective Nat'l Ins. Co. v. City of Woodhaven*, 438 Mich. 154, 476 N.W.2d 374 (1991), *Auto–Owners Ins. Co. v. City of Clare*, 446 Mich.

1, 521 N.W.2d 480 (1994), and *Traverse City Light & Power Bd. v. Home Ins. Co.*, 209 Mich. App. 112, 530 N.W.2d 150 (1995), *lv. denied*, 451 Mich. 865, 549 N.W.2d 563 (1996), from the facts presented in *Kent County*. It observed that in *Kent County*, unlike *Woodhaven*, the initial discharge into the landfill was intended to be contained. It further observed that in *Kent County*, unlike *City of Clare* and *Traverse City*, the initial discharge was at a landfill which was designed with the intent and expectation that the waste would be contained.

The *Kent County* court found additional support for its holding in cases from other jurisdictions and from the Sixth Circuit's opinion in *FL Aerospace*. 217 Mich.App. at 275–282, 551 N.W.2d at 436–438.

*South Macomb* and further acknowledging that the landfills at issue in *South Macomb* "were fraught with problems arising from their operation and maintenance", the *South Macomb* court concluded it was still proper to "focus on the discharge of contaminants from the landfills" rather than the insured's initial discharge of waste into the landfills. *Id.* See also FL Aerospace, 897 F.2d at 220 (where the court observed that the "[m]ere delivery of waste for storage at a facility that is licensed to store waste is not a discharge of pollutants into the environment").

### b. It is Proper to Separate Identifiable "Sudden and Accidental" Discharges from a Larger Pattern of Discharge

■ In *South Macomb*, the court also concluded that it is proper "to separate identifiable discharges from a larger pattern of discharge or leakage" when considering the "sudden and accidental" exception to the pollution exclusion. 225 Mich.App. 635, 572 N.W.2d 686, 700. It reached that conclusion after examining the same policy language involved here, distinguishing the same cases Insurers rely upon here, and rejecting an argument similar to one Insurers present here—that the court should avoid an improper "'microanalytical' approach." *Id.* (discussing *Ray Industries, Inc. v. Liberty Mutual Ins. Co.*, 974 F.2d 754 (6th Cir.1992) and *Lumbermens Mut. Cas. Co. v. Belleville Industries, Inc.*, 938 F.2d 1423 (1st Cir.1991)). The court found the following factors, which were present in *South Macomb*, distinguished it from those presented in the cases the Insurers relied upon: "(1) the [alleged sudden and accidental] outbreaks purportedly were identifiable and isolated; (2) they were different in kind from the overall leaking through the porous bottoms of the landfills; (3) specific damage arguably may be traced to these outbreaks; and (4) [the insured] has provided evidence of their occurrence." *Id.*

As the Sixth Circuit observed in *Petroleum Specialties*, 69 F.3d at 103–04, an insurer cannot rely on a "parade of horribles" as a strawman to support a claim that its pollution exclusion bars coverage because the pollution at the site "was certainly intentional and of long duration." *Id.* at 103–04. Find-

ing the insured's discovery responses, which described a series of discrete releases during the policy years, sufficient to survive the insurer's motion for summary judgment, the *Petroleum Specialties* court emphasized that "[t]here is no per se rule that a large amount of contamination, spread over a long period of time, must result only from intentional spills, just as a court does not presume that a small amount of contamination is from an accidental spill." *Id.* at 104. The court further clarified that although the insured's evidence was "not overwhelming" and would not be "enough by itself to warrant summary judgment" in its favor "because there is a dispute over the link between these spills and the current contamination", the evidence was "more than a scintilla" and sufficient to meet the insured's burden thus defeating the insurer's motion for summary judgment. *Id.* at 103, 106. See also Grant–Southern Iron & Metal Co. v. CNA Ins. Co., 905 F.2d 954, 955, 957–58 (6th Cir.1990) (where the court observed that, even though the sudden and accidental exception to the pollution exclusion "has a temporal component and does not describe continuous or ongoing pollution events", a "genuine issue of material fact" exists when there is evidence that the alleged damage "may have been the result of a few discrete polluting events," each of which was sudden and accidental); *Nashua Corp. v. First State Ins. Co.*, 420 Mass. 196, 648 N.E.2d 1272, 1275–76 (1995) (where the court reversed summary judgment in the insurers favor despite evidence that most of the "pollution occurred routinely, as part of its regular business activities, because the insured had presented evidence of discrete, sudden and accidental releases that could be distinguished from events that occurred as part of the insured's regular business").

This Court agrees with Dow that a blanket refusal to separate out evidence of discrete, isolated polluting events that are alleged to be sudden and accidental from allegations of overall polluting and a parade of horribles would expand the pollution exclusion and swallow the exception. Michigan law does not permit the Court to do this. *See Farm Bureau Mut. Ins. Co. v. Stark*, 437 Mich. 175, 180–81, 468 N.W.2d 498, 501 (1991) (where the Michigan Supreme Court ob-

served that policy exclusions are to be strictly construed in the insured's favor).

### c. The Insured's Summary Judgment Burden

The *South Macomb* court evaluated the sufficiency of insured's evidence of allegedly discrete, sudden and accidental discharges as follows. First, it examined whether the allegedly discrete, isolated polluting events could be considered separate from evidence of typical, ongoing, gradual discharges of pollutants or contaminants; and second, examined whether the insured's evidence was sufficient to survive a summary judgment motion challenging that these events did not meet the Michigan Supreme Court's definitions of "sudden" and "accidental." Applying that analysis to the facts presented in *South Macomb*, the court first concluded that the insured's evidence that three discrete outbreaks of leachate from the sides of the subject landfills was sufficient to permit the trial court to separate "these claimed isolated 'sudden and accidental' discharges from the overall continuous leaking of the landfills." *Id.*, 572 N.W.2d at 701. The court next evaluated whether the insured has shown that genuine issues of material fact existed as to whether these discrete events fit within the meaning of the "sudden and accidental" exception to the pollution exclusion. To be considered "sudden," the discrete discharge must be "immediate and unexpected". *Id.* at 698. To be considered "accidental," the discrete discharge must have occurred "unexpectedly and unintentionally"; "by chance and 'out of the ordinary course of things.'" *Id.*

The court, recognizing that it evaluates whether the insured "expected" the discrete discharges using an objective standard, observed that "[w]here the insured should have expected the discharge, the discharge cannot be considered 'sudden and accidental.'" *Id.* at 701 (internal quotes and citations omitted). The court then distinguished the facts presented in *City of Clare* from those presented in *South Macomb* because "the sites in [*South Macomb*] satisfied the minimum requirements for licensure and remained licensed while operating." *Id.* at 702. Thus, the court concluded, "[o]n these facts only, it cannot be said that [the insured] expected

the discharges." *Id.* at 702. The court further observed, however, that evidence of violations at the landfill could create a genuine issue of material fact whether the insured expected the subject discharges. Stated otherwise, the critical inquiry here is whether the discrete, isolated discharges were "expected", and evidence of a landfill's state-of-the-art design, licensing, and violations is probative of whether there was an expectation of containment and expectation that contaminants would not be released from the landfill into the environment.

Finally, the *South Macomb* court examined the insured's evidence regarding "each of the three allegedly distinct leachate outbreaks" separately to see if it was sufficient to create a genuine issue of material fact that the discharge was "sudden and accidental". As to the insured's claim of a 1971 discrete discharge, the court found that the insured's evidence, regarding the design and operation of the site as well as a witness' testimony that problems with underdrains resulted in a plugged system which in turn caused the 1971 outbreak, was sufficient to create "a genuine issue of material fact whether this outbreak was sudden and accidental." *Id.* at 701. As to the remaining two discrete discharges; i.e., a June 1976 outbreak and a 1980 outbreak, the court found that the insured's evidence was insufficient to create a genuine issue of material fact. The court concluded these discrete discharges could not be classified as "sudden and accidental" because the evidence showed that the outbreaks were caused by erosion gullies that were described as a typical occurrence; that the insured was aware of conditions that caused these gullies; that the insured was cited for violations that related to the generation of erosion gullies, and thus the 1976 and 1981 outbreaks should have been expected by the insured. *Id.*, 572 N.W.2d at 702–03.

### 2. Dow's Alleged "Sudden and Accidental" Polluting Events

To survive summary judgment here, Dow must come forward with evidence sufficient to create a genuine issue of material fact whether the allegedly discrete polluting events were sudden and accidental. Specifi-

cally, Dow must present evidence that at each site: (1) there was a discrete, identifiable, isolated discharge or release that can be separated from the historical, ongoing, gradual discharges or releases of pollution or contaminants that occurred in the normal course of operation; (2) each of those discrete discharges can be considered "sudden and accidental" as defined by the Michigan Supreme Court; and (3) that some of the relevant damage at a particular site arguably may be traced to these discrete "sudden and accidental" discharges. *See South Macomb; Petroleum Specialties.*

The Ten Final Sites can be separated into three categories:

1. *Dow's Manufacturing Facility Sites*
 –Conalco
 –Daffron & Pinion
 –Cliffs–Dow

2. *Third Party Waste Disposal Sites*
 –PPI
 –Silresim
 –Harris/Farley Street
 –Hartley & Hartley

3. *Dowell/DSI Sites*
 –Brookhurst, Wyo.
 –Monahans, Texas
 –Midland, Texas

Dow does not contest that summary judgment on the pollution exclusion issue is warranted under the post–1970 primary policies and post–1971 excess policies as to the Conalco, Daffron & Pinion, and Cliffs–Dow Final Sites. Dow further concedes that summary judgment is warranted as to those claims arising from the PPI/Scenic Highway site but not the PPI/Brooklawn site. Dow does contest Insurers' claim that they are entitled to summary judgment as to the remaining sites because genuine issues of material fact exist whether the polluting events identified below fall within the purview of the sudden and accidental exception to the pollution exclusion.

### a. Fireman's Fund's Pollution Exclusion Motion is Granted

Fireman's Fund brings this motion arguing Dow cannot present evidence showing the sudden and accidental exception to the pollution exclusion applies and thus excludes Dow's claims for the years 7/30/70 to 4/1/76 at the following Final Sites: Cliffs–Dow, Conalco, Daffron & Pinion, Silresim and Harris–Farley. Fireman's Fund does not seek summary judgment on the pollution exclusion with regard to the PPI, Hartley & Hartley, Brookhurst, Midland, or Monahans, Texas sites.

Fireman's Fund's motion for partial summary judgment on the pollution exclusion is GRANTED. Dow cannot point to any facts to establish any "sudden and accidental" releases at the Conalco, Daffron & Pinion, Cliffs–Dow, Silresim and Harris/Farley Street sites prior to the expiration of Fireman's Fund's policies in April 1976. As to the first three sites, Dow concedes it cannot provide evidence supporting application of the sudden and accidental exclusion for the Cliffs–Dow, Conalco, and Daffron & Pinion sites. As to the Silresim and Harris/Farley Street sites, Dow presents evidence of alleged "sudden and accidental" polluting events that took place after Fireman's Fund's policies expired in April 1976. Furthermore, with respect to the Silresim site, because Dow concedes that it did not begin its use of that site prior to 1972, there is no indemnification coverage available under Fireman's Fund's pre- or post–1970 policies.

### b. Travelers/Aetna's Pollution Exclusion Motion is Granted in Part and Denied in Part

Dow does not contest Travelers/Aetna's motion as to the Cliffs–Dow, Daffron & Pinion, and Conalco Sites. Therefore, its motion for partial summary judgment on the pollution exclusion issue is GRANTED as to those sites, and Dow is not entitled to indemnification coverage for those sites under the Aetna primary and excess policies covering the period from 1972 through 1985. As to the remaining sites, as discussed more fully below, Dow has not met its summary judgment burden with regard to allegedly "sudden and accidental" discharges at the Harris/Farley Street, Brookhurst, Midland and Monahans, Texas sites. Accordingly, Travelers' motion is GRANTED as to these Sites as well. Dow has, however, met its summary judgment burden with regard to allegedly "sudden and accidental" discharges at the PPI/Brooklawn, Silresim, and Hartley & Hartley sites, and

Travelers/Aetna's motion is DENIED as to these sites.

### (1) PPI Site

■ Petro–Processors, Inc. (PPI) operated two waste disposal sites in Baton Rouge, Louisiana. The PPI waste facility, known as the Brooklawn Site, was owned and operated by PPI from approximately 1968 or 1969 through 1980. Dow never owned or operated this site. From 1968 until late 1970, PPI disposed of Dow's waste at the Brooklawn Site.

Dow has come forward with evidence that: (1) a discrete, identifiable discharge occurred at the Brooklawn Site that can be separated from the historical, ongoing, gradual discharges of pollutants; i.e., a 1970 sudden and massive levee break; (2) this discrete discharge was "sudden" and "accidental" as those terms have been defined under Michigan law; and (3) the relevant property damage at the Brooklawn site—groundwater contamination—may arguably be traced to the 1970 massive levee break. Dow's proferred evidence is sufficient to create a genuine issue of material fact whether the 1970 levee break fits within the "sudden and accidental" exception to the pollution exclusion in Dow's policies.

As evidence of a discrete "sudden and accidental" polluting event at Brooklawn, Dow points to deposition testimony, an internal Dow document, its expert's report, and a complaint in a 1970 lawsuit brought against Dow alleging that cattle and property adjacent to the PPI/Brooklawn site were damaged as a result of a severe, massive levee break at that site. As further support, Dow presents deposition testimony that the physical evidence at the site supports the conclusion that there was a sudden, massive levee break, which was different in kind from the leaking and seepage which was also allegedly present at the site, and furthermore, the massive levee break contributed to the extent and nature of contamination at the site. *See* Robertson Dep. at 171–172, 190–195.

Dow also presents evidence which raises a genuine issue of material fact whether this 1970 discharge was "unexpected" by PPI. *See Matakas v. Citizens Mut. Ins. Co.*, 202 Mich. App. 642, 509 N.W.2d 898, 903 (1993) (where the court observed that "the focal point of the inquiry is whether the release was 'sudden and accidental' from the standpoint of the polluter"). In support of its position that PPI placed the waste in the levee with the expectation that it would be contained and therefore its release into the groundwater was unexpected and accidental, Dow presents evidence that: (1) PPI's use of the levee comported with state-of-the-art knowledge at the time; and (2) a governmental agent, who visited the site around the time of the 1970 levee break, found the levees and the total PPI/Brooklawn site to be in good order.

### (2) Silresim Site

■ This site is located in Lowell, Massachusetts and was owned and operated by Silresim Corporation from 1971 to 1977 as a chemical reprocessing and waste recycling facility. The facility was designed to recycle chemicals or convert chemical wastes to a form suitable for disposal by incinerator or at off-site landfills. Waste was accepted at the site in drums and other containers.

Silresim Corp. received a hazardous waste collection and disposal license in 1973 from the Massachusetts Division of Water Pollution Control. Silresim was also on a state list of approved waste disposal sites. Silresim provided services which included waste hauling, storage, laboratory analysis, recycling and reclaiming, and chemical waste disposal. Silresim ultimately had its license revoked. It filed for bankruptcy in March of 1977 and abandoned the property.

The facility was never owned or operated by Dow. Dow sent wastes to the Silresim Site from approximately 1974 through 1977. It had a valid license during the entire period that Dow was sending wastes to the site, and several witnesses testified that they had either visited or worked at the site during this time and found it to be well-run and satisfactory. *See* Dow Exs. 17, 19, 20, 21, 25, 27.

Dow has come forward with evidence that: (1) discrete, identifiable discharges occurred at Silresim that can be separated from the site's ordinary operations; i.e., three fires and explosions between the years 1977 and 1983; (2) these discrete discharges were "sudden and accidental" as those terms have been defined under Michigan law; and (3)

the relevant property damage at Silresim may arguably be traced to the three fires and explosions. Dow's proferred evidence is sufficient to create a genuine issue of material fact whether these alleged "sudden and accidental" polluting events fit within the exception to the pollution exclusion in Dow's policies.

Dow presents evidence of an October 22, 1977 chemical fire caused by a short circuit in an electric suction pump in a large pit containing wastes where, in addition to the raging fire, barrels exploded in the air and crashed to the ground; an August 20, 1978 fire which destroyed the site's main building including a laboratory, a storage facility, and a chemical process area; and an April 1983 fire at the site. In *Nashua Corp. v. First State Ins. Co.*, 420 Mass. 196, 648 N.E.2d 1272, 1276 (1995), the court, applying the same interpretation of the terms "sudden and accidental" as the Michigan courts, found that evidence of these same events at Silresim created triable issues of fact concerning the pollution exclusion. The court's reasoning, which was largely adopted by the *South Macomb* court, is as follows:

> a fire and subsequent explosion resulted in a release at the Silresim site. The record does not seem to establish that these events occurred as part of [the] reclamation site's ordinary operations. Furthermore, the uncommon nature of these releases tends to establish the "sudden and accidental" character of the events. Although most of the releases resulted from the reclamation site's routine business practices, it was error for the judge to grant summary judgment in favor of the defendants because the plaintiff has proffered evidence that some of the releases were indeed "sudden and accidental."

*Nashua*, 420 Mass. at 203, 648 N.E.2d at 1276.

At the hearing on this matter, Insurers stated that they were not disputing Dow's claim that the fires had occurred; rather, they were disputing that Dow has presented evidence that the fires were "unexpected" and that property damage at the Silresim site could arguably be traced to these fires. Contrary to Insurers' assertion, Dow has presented evidence, including contemporaneous newspaper articles and sworn testimony

from other lawsuits involving environmental damage at the Silresim site, that supports its position that: (1) the release of chemicals from these fires and explosions was qualitatively different from the gradual, ongoing polluting events that allegedly occurred as part of Silresim's ordinary operations; (2) the fires and releases were unexpected; and (3) the releases from the fires could arguably be traced to the relevant property damage at the Silresim site. Dow's proffer of the affidavit of a senior remediation engineer used in another lawsuit involving this same site is sufficient to survive summary judgment under the standard set forth in *Petroleum Specialties*, 69 F.3d at 103. *See Americhem Corp. v. St. Paul Fire & Marine Ins. Co.*, 1995 WL 861204, *5 (W.D.Mich. July 12, 1995) (op. amended Jan. 16, 1996) (where the district court held that statements from another legal action, provided under oath and addressing the same issues as those pending before it, were admissible as affidavits in the action pending before it).

### (3) Harris/Farley Street Site

■ The Harris/Farley Street disposal site was operated by Davis Enterprises. It was never owned or operated by Dow. It is located in Houston, Texas and occupies approximately two acres. The site is bounded on the east by Farley Street, on the south by Ellington Air Force Base, and on the west by a municipal solid waste landfill. Dow is alleged to have shipped styrene tars to the Farley site for a few months in 1958; from approximately April 1958 through June 1958.

In 1958, Davis Enterprises ceased its disposal business at the Harris/Farley Street site. Approximately 23 years later, the water in a swimming pool at a home, then located on the site, turned black. It is alleged that the swimming pool was constructed in an area near where tar wastes were disposed and these tars wastes pierced the pool's polyvinyl liner. The homeowner subsequently filled in the pool with clay but continued to express concerns about well water contamination. These concerns triggered the governmental agency environmental action that Dow seeks coverage for here.

In July 1981, after the EPA had identified the Farley Street site as a Potential Hazardous Waste site, EPA contractors conducted a field investigation which included soil borings and installation of four groundwater monitoring wells. Despite evidence that contaminants had migrated and seeped into the Farley Street site swimming pool and despite the fact that Dow's answers to interrogatories fail to identify a "sudden and accidental" polluting event at this site, Dow now claims such an event exists. Dow now alleges that, when the EPA monitoring well number 1 (MW–1) was installed in 1981, it punctured one of the containment soil zones (another zone is alleged to be in the area where the swimming pool was built) and caused groundwater to become contaminated. Dow asserts that this puncture is a "sudden and accidental" polluting event which arguably resulted in some of the property damage it was required to remediate and for which it now seeks coverage. Dow supports its argument with evidence that MW–1 is the only well showing detectable levels of groundwater contamination at this site.

Insurers argue that this Court should refuse to consider Dow's untimely claim that there is evidence of a "sudden and accidental" polluting event which it failed to identify in its interrogatory answers. Insurers further argue that, even if this Court does consider Dow's untimely claim, Dow has not met is summary judgment burden with regard to the alleged "sudden and accidental" polluting event. This Court agrees with Insurers.

The report Dow relies upon for support does not, without impermissible speculation and conjecture, give rise to the inference that the placement of MW–1 at the Farley Street site resulted in the property damage Dow was required to remediate. *See Harrow Products, Inc. v. Liberty Mut. Ins. Co.*, 64 F.3d 1015, 1020 (6th Cir.1995) (where the court observed that speculation and conjecture is insufficient to withstand a motion for summary judgment). Dow's argument ignores the very claims of groundwater contamination that brought the EPA and the monitoring wells to Farley Street in the first instance; i.e., concerns about well water contamination and contaminated wastes seeping through a swimming pool's liner and turning the pool's water black. This Court rejects Dow's belated attempt to bootstrap after-the-fact remediation efforts to support its argument that "sudden and accidental" polluting events caused the property damage it was required to remediate in the first instance.

**(4) Hartley & Hartley Site**

 The Hartley & Hartley ("H & H") landfill site is located on 200 acres in Bay County, Michigan and is surrounded by marshes and ponds, including the Tobico Marsh State Game Area. It was owned and operated by H & H from 1955 to 1978 and received both liquid and solid industrial wastes. Dow never owned or operated the facility but sent wastes to it for disposal from 1958 to 1978. There was state agency oversight and involvement at H & H from approximately 1966, and the landfill had a valid license throughout its entire period of operation. The site closed in 1978.

Dow argues that several allegedly "sudden and accidental" events at the H & H site entitle it to indemnification coverage. The first "sudden and accidental" polluting event Dow identifies is a Winter 1977 fire and explosion caused when a H & H employee, attempting to thaw a frozen line with a torch, accidentally started a huge fire and explosion of a liquid receiver tank containing 80,000 gallons of benzene which spread to other tanks. Dow presents evidence, including deposition testimony and expert reports, that: (1) the disposal facility's practices complied with contemporary standards and it was licensed during Dow's use; (2) this 1977 benzene fire and explosion was different in kind and thus can be separated from the overall, historical pollution that allegedly occurred at the site; (3) this discrete discharge was sudden and unexpected and therefore falls within the exception to the pollution exclusion; and (4) some damage at H & H could be the result of this 1977 fire and explosion; i.e., this was a huge benzene spill and benzene was found in the soil and groundwater at that site. Drawing all justifiable inferences in its favor, Dow has come forward with evidence upon which a reasonable jury could find "that some damage [at H & H] could be the result of" this alleged "sudden and accidental" 1977 fire and thus, as to this discrete event, Dow

defeats Insurers' motion for summary judgment. *Petroleum Specialties*, 69 F.3d at 103.

■■■ Dow's proferred evidence of other allegedly "sudden and accidental" polluting events at H & H, however, is insufficient to defeat the Insurers' motions for summary judgment. These additional events include a mid–1960's crude oil pipeline break, a Fall 1977 mixing tank explosion, a July 27, 1977 accidental spill from an oil line, and a few occasions from 1976 to 1978 when leachate collected outside a collection pond after H & H workers damaged underground tiles draining leachate into a collection pond. Dow's evidence does not show that these events: (1) are different in kind and thus can be separated from the historical, ongoing, gradual discharges of pollution at H & H; (2) were "sudden" and "accidental" under Michigan law; and (3) may arguably be traced to the relevant property damage at the site. Dow must do more than merely present evidence that certain events occurred and then baldly assert that they were "sudden" and "accidental" and therefore fall within the exclusion to Insurers' pollution exclusion. As *South Macomb* teaches, Dow must present evidence showing that the polluting event was uncommon, unexpected and not part of routine operations. Dow has not done that here as to these additional events. In fact, deposition testimony Dow provides as evidence of the 1976–1978 leachate discharges from a collection pond refutes rather than supports Dow's position. The testimony is that this was not an unusual event and that it occurred about two or three times a year.

In sum, at the H & H site, Insurers are not entitled to summary judgment. At trial, however, the only "sudden and accidental" polluting event to be considered is the 1977 benzene fire and explosion, and Insurers will be liable only for contamination that Dow establishes resulted from this 1977 benzene fire and explosion.

#### (5) Brookhurst Site

■■■ The Casper, Wyoming Dowell facility was owned and operated by Dow's Dowell Division from 1954 through 1984 and by Dowell Schlumberger, Inc. from 1984 through 1993. The site is adjacent to the Brookhurst subdivision. Dowell used the Wyoming facility as a base for oil-well and gas-well en-

hancement services. Its on-site operations included chemical storage in above-ground storage tanks; parts washing with various cleaning solvents; and truck washing with powdered soap and water. Relevant facilities at the site include a septic system, a concrete slab for a fume control tank, and an "acid plant" where hydrochloric acid was stored, mixed, and loaded onto trucks for use in the field. Also, in the late 1960's, an above-ground bulk storage tank was installed to contain toluene. Until the 1970's, when a new wash water system was installed, wash water drained through a vitrified clay pipe main line, through a 1,000 gallon oil/water separator tank, and into a gravel sump or pit.

In the summer of 1986, residents of the Brookhurst subdivision, which is located immediately north of the Dow/DSI Casper facility, began to complain about noxious odors and potential contamination of their drinking water. These concerns led to an investigation by the Natrona County Health Department, the Wyoming Department of Environmental Quality and the EPA. An investigation ultimately concluded that the Brookhurst subdivision groundwater was contaminated. The contamination was attributed to several of the commercial/industrial operations surrounding Brookhurst, including the Dow/DSI Casper facility.

Dow identifies two allegedly "sudden and accidental" polluting events at this site. It presents evidence that on June 10, 1982, a rail car exploded and 100 gallons of hydrochloric acid were spilled, and on December 9, 1983, 500 gallons of hydrochloric acid spilled from the acid storage tank when the gauge that was used to measure the amount of acid in the tank broke.

Insurers do not dispute that these events were temporally abrupt. Rather, they argue Dow has failed to come forward with evidence showing that these events were different in kind thus allowing them to be separated out from evidence of historical, ongoing discharges or spills of contaminants that allegedly occurred as part of the routine operations at the site. Insurers also point to record evidence showing that the amounts involved in the two spills were below the amount necessary to be reported to the gov-

ernment, and showing the spills were immediately cleaned up by neutralizing all the impacted soil and removing it off-site. In light of this evidence, Insurers assert that Dow cannot show that the soil and water contamination at this site arguably may be traced to these de minimis spills. In short, they argue a reasonable jury considering this evidence could not, without impermissible speculation and conjecture, find for Dow on this issue. This Court agrees.

Dow's expert observes that the Brookhurst facility, as part of its ongoing operations, used hydrochloric acid and had an acid plant "where hydrochloric acid was stored, mixed, and loaded onto trucks for use in the field." Dow Ex. 2, Minear Expert Report at 19–20. The expert opines that "the chlorinated hydrocarbon contamination emanating from [the Brookhurst site] is likely attributable in part to spills of hydrochloric acid." *Id.* at 19–20, 22. The expert goes on, however, to conclude that "spills at storage facilities were common at industrial operations of this sort in the relevant time period, and were not believed to cause environmental contamination." *Id.* In light of this testimony, the Court agrees with Insurers that Dow has not demonstrated that the two minor spills it identifies as "sudden and accidental" polluting events are different in kind and thus can be separated out from other hydrochloric acid spills that commonly occurred as part of Brookhurst's normal operation.

### (6) Midland Site

Dow's Midland, Texas facility was operated by its Dowell Division from 1952 to 1984, and by Dowell Schlumberger from 1984 to 1993. Dowell used the facility as a base for oil and gas well enhancement services which were performed at its customer's sites. Materials used in its operation, including hydrochloric acid, sand, cement and gasoline for the facility's trucks, were stored in above-ground and underground storage tanks at the site. The site also had acid mixing facilities, an open-topped underground concrete tank, truck washes, maintenance shops, and a laboratory. The "acid plant" had a concrete loading pad, two sumps, a 500 gallon buried steel tank, and an underground pipeline that was used to send acid plant wastewater to the underground concrete tank. The underground concrete tank operated from approximately 1955 to 1983. The tank received wastewater generated at the facility, including fluids from the acid mixing facility, the truck wash, and the laboratory sump, before those fluids were removed for disposal.

Dow identifies a number of allegedly "sudden and accidental" events which it argues remove its claims from the purview of the pollution exclusion. The first involves the discovery in 1978 of a crack or hole in the underground concrete tank located at this site. The testimony of Mr. Leininger, the manager of this facility, however, refutes rather than supports Dow's claim that discharges from this crack or hole were "unexpected" or "abrupt" and thus "sudden and accidental." Mr. Leininger testified that when he first arrived at the facility, he could see a crack or hole in the tank; and when he asked about it, he was told that the pit "did not have very good integrity and would not hold liquid as a general rule." Leininger Dep. at 138. Mr. Leininger further testified that "I proceeded to plug the thing up as best I could." *Id.* He plugged the hole or crack with cement and "[a]pparently it was successful, given we at least had to vacuum it out on more and more occasions after that." *Id.* at 139. Dow's argument that any subsequent releases from this crack were "sudden and accidental" is not supported by the record evidence. Furthermore, a similar argument was recently rejected by the Sixth Circuit in *Ray Industries,* 974 F.2d at 768–69.

In *Ray Industries,* the insured argued, despite a stipulation that "barrels were routinely crushed on a regular basis", that each discharge from a crushed barrel "was sudden, when viewed in isolation." *Id.* at 768. Rejecting the insured's argument, the *Ray Industries* court observed that "under this theory, all releases would be sudden; one can always isolate a specific moment at which pollution actually enters the environment. Rather than pursing such metaphysical concepts, we choose to recognize the reality of [the insured]'s actions in this case." *Id.* at 768–79. The court quoted with approval a decision from the First Circuit addressing a similar claim:

[m]ere speculation under these circumstances that any individual instance of disposal, including leaks, occurred "suddenly" cannot contradict a reasonable reading of the allegations that the entire pattern of conduct was not a "sudden and accidental" occurrence.

*Id.* at 769 (quoting *A. Johnson & Co., Inc. v. Aetna Cas. and Sur. Co.,* 933 F.2d 66, 75 (1st Cir.1991)). The decision in *South Macomb* is not to the contrary. *South Macomb,* as an important initial step in the "sudden and accidental" analysis, observes that the insured must present evidence that shows the allegedly discrete, isolated "sudden and accidental" polluting event is different in kind and thus may be considered separate from evidence of typical, ongoing, gradual discharges of pollutants or contaminants at the site. Dow has not done that here.

 Dow also identifies the 1989 discovery of holes in the underground gasoline storage tanks as evidence of a "sudden and accidental" polluting event at the Midland site. These holes were discovered in 1989 when the tanks were removed. Dow baldly asserts, without evidentiary support, that "regardless of how these holes developed, there can be no dispute that the original release was sudden." The "Underground Storage Tank Removal" report prepared for Dow refutes rather than supports its position. It provides that these tanks "were not designed for burial.... [and][t]he tops of both tanks were rusted through and leaking." Dow Ex. 70 at 12. This evidence does not support an inference that the original release occurred "suddenly." Rather, it gives rise to the inference that discharges from the rusted tanks occurred gradually over a long period of time. As the *Ray Industries* court observed, isolation of a specific moment when pollution first entered into the environment on these facts is nothing more than mere speculation. *Ray Industries,* 974 F.2d at 768–69.

 Dow further argues that unintended occasional overfills of underground storage tanks and the December 30, 1983 overfill of an acid tank constitute evidence of "sudden and accidental" polluting events that remove its claims from the purview of the pollution exclusion. This Court disagrees.

As to the overfilling of underground storage tanks, the report Dow relies upon for support states that "[t]here was visible evidence of overfilling." Dow Ex. 70 at 11. This evidence does not support an inference that these overfills were unexpected in the course of daily operation at the site. Moreover, as the Sixth Circuit observed in *Harrow Products,* 64 F.3d at 1020, evidence of "occasional accidental spills" without further evidence of "specific instances" does not suffice as even a scintilla of evidence "on an issue on which [the insured] carries the burden of production and persuasion". It is not "evidence on which the jury could reasonably find for the plaintiff." *Id.* (internal quotes and citation omitted). Rank speculation cannot substitute for facts demonstrating the existence of a "sudden and accidental" release.

 As to the December 1983 overfill of the acid tank, Dow provides no evidence that would distinguish this event from its routine operation at this site. As stated above, Dow must do more than merely identify an isolated event and baldly assert that it was a discrete, "sudden and accident" polluting event. As the court observed in *South Macomb,* Dow must present evidence showing that the event was an uncommon, unexpected event and not part of its routine operations and showing that property damage at the site may arguably be traced to this event. Dow has not done that here.

### (7) Monahans Site

The Monahans, Texas facility was operated by Dow's Dowell Division from 1960 to 1984, and by Dowell Schlumberger, Inc. from 1984 to 1993. This facility was used as a base for oil and gas well enhancement services which were performed at its customer's operations. Its features included above-ground storage tanks, underground storage tanks, a surface impoundment, a drum storage area constructed in 1972, a truck wash which began operating in 1962, and an "acid plant" constructed in 1972. The surface impoundment was constructed and placed into operation in 1960, and was used until approximately 1983. The surface impoundment received all the waste water generated at the facility, includ-

ing fluids from the truck wash and acid plant. Acid was handled and disposed at the facility when operations began in 1960. After the acid plant was constructed, it was used to store and blend the hydrochloric chemical mixtures used for acidizing wells.

In support of its argument that there were "sudden and accidental" polluting events at the Monahans site, Dow presents evidence that when the two underground tanks were removed, it was discovered that they had holes in the bottoms. Relying on this evidence, Dow asserts that the initial release "was clearly sudden." Similar to the situation above, Dow's assertion is refuted, not supported, by the report prepared for it detailing the removal of these underground storage tanks. The report provides that "[h]oles of varying sizes" were observed once these tanks were removed, and further provides that "[t]hese 27 year old steel tanks were pitted with corrosion and had holes up to one inch in diameter in the upper and lower surfaces. The piping on Tank 2 had holes on the lower surface." Dow's Ex. 72 at 12, 6. The report describes the tanks as being "pitted with corrosion." This evidence supports the inference that the holes developed gradually over a long period of time; not suddenly or abruptly.

Dow also claims that unspecified spills at the Monahans' acid plant fall within the purview of the "sudden and accidental" exception to the pollution exclusion. Dow provides no evidence (1) identifying specific spills; (2) demonstrating that they were different in kind and thus could be considered separate from the ongoing, typical polluting events occurring at Monahans' acid plant as part of its routine operations, or (3) showing how

these unspecified spills were "sudden" and "accidental" as those terms have been defined under Michigan law. This is just the sort of rank speculation and conjecture the Sixth Circuit found insufficient to withstand summary judgment in *Harrow*, 64 F.3d at 1020. Accordingly, Insurers are entitled to summary judgment here as well.

### B. Loss–In–Progress/ Known Loss Doctrines

Travelers/Aetna's ("Insurers") motion here asserts that Dow knew of a loss in progress at two of the Final Sites—Hartley & Harley and PPI—when it purchased some policies thus barring indemnification coverage under those policies.[6] Dow's cross-motion asserts that (1) the Michigan Supreme Court would not adopt the loss-in-progress doctrine in this context; and (2) the doctrine, if adopted, would not bar coverage here. The relevant policy language promises that the insurer will "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages" because of personal injury or property damage. Dow Resp., Ex. 3.

Dow correctly frames the critical issue under the loss-in-progress doctrine: Did Dow buy the subject policies knowing of the loss for which it now seeks coverage? The difficult question is "what precisely has to have been 'known' prior to a liability policy's inception date for purposes of precluding coverage under general insurance principles." *UTI Corp. v. Fireman's Fund Ins. Co.*, 896 F.Supp. 362, 377 (D.N.J.1995). Insurers and Dow come up with opposite answers to the

---

**6.** Travelers/Aetna is moving on excess policies issued by Aetna beginning in 1972 and primary policies issued by Aetna beginning in 1976.

Eight Excess Insurers, who covered Dow for various time periods, have joined Travelers/Aetna's motion. These Excess Insurers and their policy periods are: First State (6/11/76–6/11/72); Interstate Fire & Casualty (6/1/75–6/11/76); Highlands (6/11/75–6/11/76); Employers Insurance of Wausau (12/1/84–12/1/85); Nationale–Nederlanden (6/11/75–6//78); American Home Assurance Company (6/11/71–6/11/72 and 6/11/75–6/11/78); Insurance Company of the State of Pennsylvania (6/11/75–6/11/78); and National Union Fire Insurance Company (6/11/75–11/24/76).

Century Indemnity and related companies also joined in Travelers/Aetna's motion but did not specify the policies prior to which Dow allegedly knew of a "loss-in-progress." Dow notes that Century's primary policies covered Dow from June 1, 1944 to March 28, 1949 and therefore these policies cannot be at issue with respect to the PPI and Hartley & Hartley Sites where Dow was not involved until the 1960's and 1950's, respectively. Dow presumes that Century is seeking to apply the "loss-in-progress" doctrine to California Union's 6/11/72–6/11/76, Central National's 6/11/75–10/2/76 and Pacific Employer's 12/1/84–1/1/86 excess policies.

core question by defining the doctrine and the relevant loss differently.

Insurers assert that the Michigan courts would recognize a version of the doctrine that uses an objective standard thus barring indemnification if Dow knew or should have known that the underlying property damage—contamination Dow ultimately remedied and seeks coverage for here—was occurring before Dow purchased the subject policies. Insurers' analysis, with its use of an objective standard, widens the scope of the loss-in-progress doctrine and carries with it the danger of barring coverage for known risks as opposed to known losses.

Dow, on the other hand, promotes a very narrow application of the doctrine. Dow argues that, if the Michigan Supreme Court were to adopt the doctrine in the context of an environmental insurance dispute, it would recognize a version of the doctrine more akin to that used in California and New Jersey; i.e., coverage will be barred only if, at the time the policy is purchased, the insured: (1) has subjective knowledge of the specific contamination it subsequently remediated and for which it now seeks coverage; and (2) knows it will be held legally responsible for damage arising from that contamination. *See Pittston Co. Ultramar America Ltd. v. Allianz Ins. Co.*, 124 F.3d 508 (3rd Cir.1997); *Montrose Chem. Corp. of Cal. v. Admiral Ins. Co.*, 10 Cal.4th 645, 42 Cal.Rptr.2d 324, 913 P.2d 878, 906 (1995) (en banc).

Dow's version of the doctrine distinguishes between first party insurance policies and third party liability policies and recognizes that in the third party situation, such as that presented here, the relevant loss is not the injury or property damage itself, "but rather the company's legal liability arising therefrom." *UTI Corp.*, 896 F.Supp. at 377. Under this version, the doctrine will bar coverage only when the insured's liability becomes a legal certainty. Prior to that time, it recognizes the insured's loss as only a contingency and thus an insurable risk. Subjective knowledge of the alleged property damage is required because the doctrine is designed to prevent insureds from fraudulently obtaining insurance to cover losses that are not only certain but are also known to the insured. Dow urges the Court to recognize this version of the doctrine and

argues that, because it did not know of the alleged property damage or its legal liability before it purchased the subject policies, Insurers cannot avoid their contractual obligations to indemnify Dow for its losses at these two sites.

■ Both Insurers and Dow push for an application of the loss-in-progress doctrine that cannot be reconciled with that recognized by the Sixth Circuit in *Inland Waters Pollution Control, Inc. v. Nat'l Union Fire Ins. Co.*, 997 F.2d 172 (6th Cir.1993) (*Inland Waters II*). The *Inland Waters II* court predicted that the Michigan Supreme Court would adopt a version of the loss-in-progress doctrine that is neither as broad as Travelers would have this Court believe nor as narrow as Dow construes it. The Michigan Court of Appeals, in *South Macomb*, recently applied the *Inland Waters II* court's version of the loss-in-progress doctrine in an environmental insurance dispute. It observed that the doctrine "has limited force" and applies only if, prior to the time the insured purchased the subject policy: (1) the loss at issue had already occurred; and (2) the insured had the requisite foreknowledge; i.e., the insured "must have been aware of, at a minimum, an immediate threat of injury to persons or property." 225 Mich.App. 635, 572 N.W.2d 686, 705. *Inland Waters II* identifies the alleged property damage that the insured is later held responsible for as the relevant loss; not the insured's legal liability arising therefrom. 997 F.2d at 179.

### 1. The Known Loss and Loss–in–Progress Doctrines

As the Michigan Supreme Court observed in *American Bumper v. Hartford Ins.*, 452 Mich. 440, 550 N.W.2d 475 (1996), it has recognized that "a completed loss is not covered under an after-acquired insurance policy," but it "has yet to apply the loss-in-progress doctrine in the context of an environmental dispute." *Id.*, 550 N.W.2d at 484. The Court did not adopt the loss-in-progress doctrine in *American Bumper* because it was not necessary to do so on the facts presented. *Id.* The facts presented in this case, however, do require analysis and application of the loss-in-progress doctrine.

"The known loss doctrine is a common law concept that derives from the fundamental requirement of fortuity in insurance law." *Pittston*, 124 F.3d at 516. Its basic premise is that insurance policies are intended to protect insureds against risks of loss; not losses that have already taken place or are substantially certain to occur. Accordingly, the doctrine is properly invoked when the insured "knows" about the claimed loss before the policy is purchased. "[T]he 'loss in progress' doctrine, as a variant of the 'known loss' doctrine, has its roots in the prevention of fraud. Because insurance policies ... are designed to insure against fortuities, a fraud is worked when they are misused to insure a certainty." *Inland Waters II*, 997 F.2d at 179 (internal citation omitted).

The Sixth Circuit has predicted that the Michigan Supreme Court would recognize the loss-in-progress doctrine. *See Inland Waters II*, 997 F.2d at 175. *See also South Macomb*, 572 N.W.2d at 704–05 (where the Michigan Court of Appeals applied the *Inland Waters II* court's formulation of the loss-in-progress doctrine). In *Inland Waters II*, the Sixth Circuit reversed a district court decision applying the loss-in-progress doctrine because it failed to require, as an essential element, the insured's foreknowledge of the eventual loss for which the insured was seeking coverage. 997 F.2d at 175, 178. The court observed that decisions applying the loss-in-progress doctrine invariably required "either (1) an awareness of a loss on the part of the insured or (2) an immediate threat of loss tantamount to foreknowledge in order for the doctrine to defeat coverage." *Id.* at 176. The court concluded that:

> [t]he lesson of these cases defining and applying the "loss in progress" doctrine is that *the doctrine operates only where the insured is aware of a threat of loss so immediate that it might fairly be said that the loss was in progress and* that *the insured knew it* at the time the policy was issued or applied for. (Emphasis added).

*Id.* at 178. Accordingly, the court held that Michigan's version of the loss-in-progress doctrine "requires foreknowledge of loss or an awareness of an immediate threat of loss on the part of the insured" at the time the insurance policy is purchased. *Id. See South Macomb*, 572 N.W.2d at 705 (where the court

observed that the doctrine can be applied only where the insured has this requisite foreknowledge).

In *Inland Waters II*, the insured was a disposal company that had crushed some drums containing waste and, in turn, spilled that waste on the ground at a customer's facility. The disposal company was sued after a subsequent investigation revealed soil and groundwater contamination at that site. After observing that the Michigan Supreme Court would adopt the loss-in-progress doctrine and determining what knowledge must be shown to invoke the doctrine, the court held that questions of fact remained as to whether the doctrine would bar indemnification in the case before it because there were questions whether the insured knew, at a minimum, that the spill "posed an immediate threat of damage to the groundwater." *Inland Waters II*, 997 F.2d at 179.

■ Other courts have likewise recognized that the fortuity-based doctrines of known loss and loss in progress must be "judged using a subjective standard" because requiring this "knowledge element best serves the overall principle of insurance law." *United Technologies Corp. v. American Home Assur. Co.*, 989 F.Supp. 128, 148, 150 (D.Conn.1997). A subjective standard also protects against the misuse of hindsight to avoid indemnification coverage. As one court explained:

> the purpose of the loss in progress doctrine, preventing fraud, will be served by a subjective knowledge analysis. The insurer is protected because the insured cannot misrepresent its knowledge to the insurer. The insured is protected because the insurer cannot refuse responsibility merely by learning of facts that both parties previously were unaware of.

*Id.* at 151.

■ Accordingly, application of the loss-in-progress doctrine as defined by the *Inland Waters II* court, which focuses on the insured's subjective knowledge, permits the courts to consider the insured's inability to have foreknowledge of a relevant loss when, as Dow claims, it believes it was disposing of waste properly and becomes subject to liability due to a dramatic change in the law years

later that broadly extends the scope of responsibility for environmental remediation. *See Astro Pak Corp. v. Fireman's Fund Ins. Co.,* 284 N.J.Super. 491, 665 A.2d 1113, 1116–17 (1995), *cert. denied,* 143 N.J. 323, 670 A.2d 1065 (1995). *Inland Waters II,* however, identifies the contamination or property damage the insured is later held responsible for as the relevant loss; not the insured's legal liability arising therefrom. 997 F.2d at 179. Accordingly, the crucial issue here is whether Dow was aware, at a minimum, of an immediate threat of the contamination for which it was ultimately held responsible and for which it now seeks coverage; not Dow's awareness of its legal liability for that contamination.

### 2. Did Dow Have the Requisite Foreknowledge As to Property Damage At the PPI and Hartley & Hartley Sites

#### a. PPI—Brooklawn Site [7]

■ Groundwater contamination is the relevant property damage at this site. Insurers dispute Dow's claim that it did not know about groundwater contamination at this site before it purchased the Aetna excess policies in 1972, the Aetna primary policies in 1976, and the various other excess policies issued by the Excess Insurers filing Joinders. Insurers argue that the record evidence shows that: (1) Dow understood the *risk* of groundwater contamination from improper waste disposal methods used at Brooklawn since 1951; (2) the *Ewell* litigation in 1970 alerted Dow to the risk of groundwater contamination at that site; and (3) by the conclusion of the first *Ewell* trial in 1976, there was significant evidence that pollution from Brooklawn had entered the groundwater.

Dow, in support of its motion, presents evidence showing that: (1) it believed the soils at the PPI site consisted of impermeable clays; (2) it believed its wastes were insoluble; (3) groundwater contamination was not an issue in the *Ewell* litigation and is

not discussed in the trial testimony Insurers rely upon; (4) it did not know of groundwater contamination or the immediate threat of groundwater contamination at the PPI Brookhurst site when it purchased the subject policies; and (5) groundwater contamination is what Dow is required to remediate at this site.

Insurers' and Dow's cross motions for summary judgment on the loss-in-progress motion both are DENIED as to this site. Genuine issues of material fact exist regarding whether Dow was aware, at a minimum, of an immediate threat of groundwater contamination at the PPI Brooklawn site before it purchased the subject policies. Dow does concede, however, that it was aware in 1984 of its liability to remediate contamination at this PPI site. Dow Br. at 26, 28. Accordingly, Excess Insurer Employers Insurance of Wausau is entitled to summary judgment as to this site under its 12/1/84–12/1/85 excess policy. Excess Insurer Pacific Employer is likewise entitled to summary judgment as to this PPI site under its 12/1/84–1/1/86 policies.

#### b. Hartley & Hartley Site

Insurers also claim that the record evidence shows that, prior to the time Dow purchased the subject insurance policies: (1) Dow was advised that its wastes, which it sent to be disposed at the Hartley & Hartley landfill, were contaminating groundwater at that site as well as at the adjoining Tobico Marsh area; and (2) Dow had collected and analyzed groundwater samples in the vicinity of the Hartley & Hartley landfill which confirmed that contamination was emanating from the Hartley & Hartley operation. Accordingly, Insurers' argue, the loss-in-progress doctrine bars Dow's indemnification claims as to this site. Insurers support their position with record evidence that: (1) Arlow Boyce, a former MDNR employee, met with Dow's Board of Directors in 1969 and informed it that Dow's wastes were being

---

7. Insurers' loss-in-progress motion also addresses the duty to indemnify under Aetna's primary policies beginning in 1976 and its excess policies beginning in 1972 at the PPI/Scenic Highway site. In light Dow's concession that claims at the PPI/Scenic Highway site are barred under the

pollution exclusion contained in its post–1970 primary insurance policies and 1971 excess policies, it is unnecessary to address Insurers' arguments as to application of the loss-in-progress doctrine at the PPI/Scenic Highway site.

burned rather than land filled by Hartley & Hartley, thus contaminating that site and the adjoining Tobico Marsh; (2) Dow was concerned in 1969 and 1970 that its wastes, which were sent to Hartley & Hartley for disposal, could possibly be contaminating groundwater; (3) Dow's own water samples showed higher chloride levels than did the MDNR's water samples; (4) saran waste from Dow was one source of the increased chloride levels in the groundwater at this site; and (5) chlorides were one of the sources of groundwater contamination at this site identified by the governmental agency requiring remediation.

Dow, on the other hand, contends that, at the time it purchased the subject insurance policies, it was unaware of the contamination at the Hartley & Hartley site for which it now seeks indemnification. Dow responds that the record evidence shows that: (1) Hartley & Hartley was a fully licensed landfill facility the entire time Dow sent materials there; (2) Dow's own inspections at the site did not reveal a loss in progress; (3) Mr. Boyce's testimony about an alleged presentation to Dow's Board of Directors is disputed by the Dow employee who purportedly arranged the meeting; (4) the MDNR's contamination concern in 1969 and 1970 focused on higher chloride levels detected in surface water sampling at the Tobico Marsh area which it attributed to the disposal of brine products by an oil field service company and not Dow; (5) the July 1969 MDNR report Insurers rely upon concluded that the increased chloride levels in the surface water samples was caused by the disposal of brine products and was not a serious condition; (6) the July 1969 MDNR report merely noted the potential for groundwater contamination if the disposal of brine products from the oil field operation was allowed to continue, Travelers Br., Ex. 68 at 3–4; (7) internal MDNR memoranda indicating that Dow expressed concern that Hartley & Hartley's disposal of its wastes not cause groundwater contamination and its request of duplicate water samples does not constitute evidence that Dow was aware of any such groundwater contamination before it purchased the subject poli-

cies; and (8) increased chloride levels in surface waters at the Tobico Marsh area is not the contamination that drives Dow's liability at the Hartley & Hartley Site.

Insurers and Dow's cross motions for summary judgment on the loss-in-progress doctrine are both DENIED as to this site as well. Genuine issues of material fact exist regarding whether Dow was aware of, at a minimum, an immediate threat of groundwater contamination at the Hartley & Hartley site before it purchased the subject policies.

## C. Lack of Property Damage

In light of the Michigan Supreme Court's recent decision in *Gelman Sciences, Inc. v. Fidelity & Cas. Co.*, 456 Mich. 305, 572 N.W.2d 617 (1998), indemnification coverage under Travelers' 3/20/50–11/19/56 policy period is triggered if Dow can show that the relevant property damage; i.e., soil or groundwater contamination, occurred during this policy period. 572 N.W.2d at 626. Travelers' motion for partial summary judgment here argues that Dow cannot establish that there was actual property damage at nine of the ten Final Sites during its policy period. Travelers does not include the Cliffs–Dow site in its motion.[8] Specifically, Travelers argues that, because Dow cannot show that there were any releases of contaminants prior to the expiration of its policy period, Dow cannot show that actual property damage occurred before its policy period expired on November 19, 1956.

Dow concedes that its first involvement at the Daffron & Pinion, Harris/Farley Street, Hartley & Hartley, Monahans, PPI and Silresim sites post-dates the 11/19/56 expiration of the Travelers' policy period. As to the remaining Brookhurst, Conalco and Midlands sites, Dow relies upon proffered evidence and testimony of its expert on hydro geology and contaminant transport and argues that material questions of fact exist concerning whether contaminating operations were in use and discharging contaminants and whether actual property damage occurred before Travelers' policy period expired.

---

**8.** Travelers' motion is Joined with respect to Conalco Only by the AIG Defendants (American Home Assurance Co., Insurance Co. of the State of Pennsylvania, and National Union Fire Insurance Co. of Pittsburgh, Pennsylvania).

## 1. The Travelers' Policy Language

Travelers issued a series of primary general liability policies to Dow for the period 3/28/50–11/19/56.[9] These policies provide that Travelers is "to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof." Trav. Br., Ex. 1. These are "occurrence" policies, and "occurrence" is defined as: "[e]ither an accident or continuous or repeated exposure to conditions *which results during the policy period* in injury to persons or real or tangible property which is accidentally caused." *Id.* (emphasis added).

## 2. Dow's Evidence Whether Property Damage Occurred During Travelers' Policy Period at the Brookhurst, Conalco, and Midland Sites

### a. Brookhurst

██ In 1954, the Dowell, Inc. division of Dow purchased two five-acre parcels of land in an industrial area located approximately two miles east of Casper, Wyoming. This parcel is referred to here as the Brookhurst site. One of the primary sources of groundwater contamination at this site is a truck wash bay with an underground wash water disposal system which Travelers claims was not put into use until after Travelers' policies expired in November 1956. In support, Travelers points to internal Dow correspondence, dated January 20, 1987, which states that "[b]ased on construction drawings and letters in the files, the washbay disposal system has been in service since April 1958." Travelers' Br., Ex. 4.

Dow responds with evidence that it claims supports its position that: (1) the wash water disposal system at issue here was actually built in 1954; (2) the system was put into use immediately after it was built; and (3) releases from the wash water disposal system began impacting the groundwater at the Brookhurst site in 1955 thus showing there was property damage before Travelers' policies expired in November 1956. The evi-

dence Dow relies upon is as follows: (1) a "Bill of Materials" issued on 9/15/54 allegedly describing products purchased and used in the construction of the permanent station warehouse building, including a wash bay drain, waste pit, sewer and septic line, sump pump, and septic tank (Dow Ex. 1); (2) Dow's dated record of construction revisions completed at the site which, at note F, indicates 1956 revisions to an existing water disposal system (Dow Ex. 2); (3) November 5, 1957 Dow correspondence discussing plans for a proposed office building which refers to an "existing septic tank and disposal system" and also states that operators and mechanics, as well as service engineers, a sales engineer and a manager, were present and working at the site in November 1957 (Dow Ex. 3); and (4) the affidavit of its expert on hydro geology and contaminant transport, Mr. David R. Hargis, who, after analyzing the contaminants at issue at this site, the nature and extent of contamination present at the site, the soil, groundwater, and subsurface conditions present at the site, as well as the site's historical operations, concluded that "releases from this source began contaminating groundwater within the first year that it began operating" and "[t]hus, groundwater contamination resulting from use of the wash water disposal system began no later than 1955." Dow Ex. 3, Hargis Affidavit at 9–10.

Dow asserts that this evidence is sufficient to show a genuine issue of material fact exists as to whether there was property damage at Brookhurst before Travelers' policy period expired in November of 1956. Travelers responds that Dow's expert's conclusion that the wash water disposal system was put into operation in 1955 is based upon the same record evidence proferred here, is insufficient to give rise to a reasonable inference that contaminants were being discharged into the wash water system prior to 11/19/56 when its policies expired, and thus is insufficient to defeat its motion for summary judgment as to this Brookhurst site. This Court agrees.

---

**9.** Travelers and Dow are in dispute over the precise time period Travelers insured Dow, however, they agree that the policy period expired on 11/19/56. For purposes of this motion, Travelers

has assumed the existence of all alleged policies covering the following periods: (1) 3/28/50— 3/28/53; (2) 3/28/53—3/28/54; (3) 3/28/54— 6/1/54; and (4) 6/1/54—11/19/56.

Dow presents no evidence which explicitly states when the wash water disposal system was put into use and what contaminants were discharged prior to 11/19/56. Rather, it asks the Court to draw these inferences from the above documentary evidence. This evidence, however, "suggests merely a possibility, as opposed to a probability," that the disposal system was in use and discharging contaminants during the Travelers' policy period. *Textron Inc. By and Through Homelite Div. v. Barber–Colman Co.,* 903 F.Supp. 1558, 1565 (W.D.N.C.1995). As the court observed in *Barber,* "for an inference to be *permissible* it must be *reasonable,* and whether an inference is reasonable cannot be decided in a vacuum; it must be considered in light of the competing inferences to the contrary." *Id.* at 1564 (internal quotes and citations omitted). The competing inferences here are that there were no contaminants discharging into the Brookhurst site disposal system during Travelers' policy period. Dow's proferred evidence does not advance its position beyond the realm of speculation and conjecture. Speculation and conjecture are not sufficient to defeat summary judgment.

Dow has not persuaded the Court that Mr. Hargis' opinion concerning the date the wash water disposal system was first put into use, as opposed to his opinions based upon his expertise on hydro geology and contaminant transport, concerns something "more than inferences to be drawn from the record" and thus "is not 'expert' in any meaningful sense." *Id.* In the context of this motion, Travelers has not contested the reliability of Mr. Hargis' methodology or conclusions that, once released, chemicals would immediately impact the groundwater at this site. Rather, Travelers asserts that Mr. Hargis' assumption that the wash water disposal system was in use and discharging chemicals immediately after it was installed is not supported by the record evidence. Mr. Hargis' affidavit does not identify specific documents, interviews, deposition testimony, or other record evidence upon which he bases his conclusion that the "[r]elease of chemicals from the wash water disposal system began impacting groundwater in 1955." Dow. Ex. 3, Hargis Aff. at 5. Dow, in its response and at oral argument, failed to demonstrate that Mr. Hargis' conclusion as to when contamination first occurred was based on something other than the inferential process found inadequate here. Accordingly, "such testimony will be insufficient to defeat a motion for summary judgment." *Hayes v. Douglas Dynamics, Inc.,* 8 F.3d 88, 92 (1st Cir.1993), *cert. denied,* 511 U.S. 1126, 114 S.Ct. 2133, 128 L.Ed.2d 863 (1994) (where the court observed that "[a]lthough an expert affidavit need not include details about all of the raw data used to produce a conclusion, or about scientific or other specialized input which might be confusing to a lay person, it must at least include the factual basis and the process of reasoning which makes the conclusion viable in order to defeat a motion for summary judgment"). Travelers' motion is GRANTED as to the Brookhurst site.

### b. Conalco

The alleged property damage at the Conalco site consists of soil contamination from the disposal of low-level radioactive waste sludge generated from Dow's production of thorium alloys at that site. Travelers contends that Dow cannot show property damage could have occurred at the Conalco site during its policy period because it cannot establish that radioactive sludge generated from Dow's thorium-related operations came into direct contact with the soil until, at the earliest, 1958. Travelers concedes there is evidence that thorium sludge was generated in 1956. It disputes, however, that Dow can come forward with competent evidence to support its claim that this thorium sludge was disposed of in any manner other than in barrels. Travelers' relies upon deposition testimony of a Conalco site employee and a February 24, 1956 document and argues that: (1) raw thorium metal first arrived at this site on February 15, 1956; (2) in 1957 or 1958, Conalco site employees were told to separate the thorium sludge from other waste materials and to store it in steel barrels; (3) after two to three years, these barrels eroded; and (4) the thorium sludge came in direct contact with the soil in 1958 at the earliest.

Dow responds with deposition testimony of this same Conalco employee and an August 16, 1956 report, prepared by another Dow

employee, and asserts that this preferred evidence is sufficient to defeat summary judgment. This Court agrees. Dow's evidence supports its position that: (1) thorium operations took place at this site in 1956; (2) these operations generated thorium sludge before Travelers' policies expired; (3) the thorium sludge was disposed of in the same manner as the other sludge produced at this site; i.e., it was "dumped on the ground"; (4) barrels were first used for thorium sludge in 1957 or 1958 when this waste was initially segregated from other wastes generated at the Conalco site; and (5) after the 1957 or 1958 directive to separate thorium sludge, no one went to the existing sludge pile and actually segregated the thorium waste that was already there. *See* Dow Resp., Ex. 6, Smith Dep. at 46–51, 143–145.

Dow's evidence demonstrates that genuine issues of material fact exist as to whether property damage occurred during Travelers' policy period which expired on November 19, 1956. Travelers is correct, however, that Dow has not come forward with any evidence to show that property damage could have occurred during the 3/28/50–6/1/54 policy periods, and thus it is entitled to summary judgment as to those policies at this site. Accordingly, as to the Conalco site, Travelers' motion is DENIED in part and GRANTED in part.

### c. Midland Site

■ In its motion, Travelers also argued that Dow could not establish that property damage resulted during its 3/28/50–11/19/56 policy period at the Midland, Texas site because: (1) as to the identified sources of contaminants at this site, only the underground concrete waste disposal tank was in place in 1956; and (2) a report authored by Dow's remediation consultants, Geraghty & Miller, indicated that there were no known or documented releases from this concrete tank. Travelers' Ex. 21 at 6–7.

Dow responded that Travelers' reliance on the Geraghty & Miller report was misplaced because: (1) the reasonable inferences to be drawn from the cited portion of the report were that, although soil and groundwater contamination was later discovered in the vicinity of the concrete tank, there were no known or documented releases while it re-

mained in use, and thus there was no awareness of contamination until the concrete waste disposal tank was no longer in service; (2) there was no discussion in the report as to when contamination may have first occurred; and, contrary to Travelers' assertion, no such inference can be drawn from this evidence; (3) deposition testimony of one of the consultants who generated this report confirmed that the Geraghty & Miller firm was retained by Dow to work on remediation for existing contamination at the Midland site; the firm was not hired to determine when contamination occurred; (4) this witness testified that the firm did not attempt to conduct any computer modeling to determine the timing of releases of contaminants into either the soil or the groundwater at the Midland site, Dow Resp., Ex. 7, Schmidt Dep. at 351–52, 375; whereas, in contrast, as the affidavit of Dow's hydro geology expert, Mr. Hargis, presented here indicates, he has conducted computerized groundwater modeling, has analyzed the timing of soil and groundwater contamination, and has, based on this and other documentary evidence, concluded that *contamination from the underground concrete tank at this site began in 1956*, Dow Resp., Ex. 5 at 15–16, 12–13, 16–17; and (5) Mr. Hargis' affidavit also supports Dow's position that soil and groundwater contamination from both the first acid plant and the northern septic tank associated with the facility's maintenance shop began no later than 1954—two years before Travelers' policy period expired. *Id.* at 16–17. Mr. Hargis' affidavit, however, does support Travelers' position that there could be no property damage at the Midland site resulting from four underground fuel tanks which were installed in 1957; after Travelers' policies expired on 11/19/56.

Travelers now informs the Court that, after the March 9, 1998 motion hearing, one of its experts, through its own investigation of the site, "discovered an aerial photograph showing that the northern maintenance shop, which was presumably connected to the northern septic system, was in fact in existence as of May 1954; two and one-half years before Travelers' policies expired." *See* 3/27/98 Travelers' Partial Withdrawal at 2–3. Accordingly, Travelers withdraws that por-

tion of its motion regarding the lack of property damage at this site during Travelers' 3/28/54–6/1/54 and 6/1/54–11/19/56 policy periods. Travelers, while conceding that the aerial photograph would preclude summary judgment for the above policy periods, emphasizes that Dow must still establish at trial that damage actually occurred during these policy periods. *Id.* at 3.

Despite Travelers' partial withdrawal, questions of fact still remain regarding whether property damage resulted from the northern septic system at the Midland site during an earlier Travelers' policy period covering as least part of 1954 and whether property damage resulted from the underground concrete tank in 1956. Accordingly, Travelers' motion for summary judgment is DENIED in part and GRANTED in part (as to the time periods from 3/28/50—12/31/53) as to the Midland site.

### 3. Summary

Travelers' motion is GRANTED as to the Brookhurst site; DENIED in part and GRANTED in part as to the Conalco site; and DENIED in part and GRANTED in part as to the Midland site.

Moreover, the AIG Defendants' Joinder in Travelers' motion is DENIED. AIG Defendants merely adopt Travelers' arguments regarding the alleged lack of property damage at the Conalco site prior to November 1956 and make no effort to establish a lack of property damage at that site for the policies which covered periods between 1971 and 1978.

### D. Dow "Not a Named Party"

■ Fireman's Fund's motion here contends that it has no duty to indemnify Dow for third-party suits or for governmental agency actions not brought against Dow.[10] These include: at the Brookhurst site, the State of Wyoming suit against DSI; at the Midland site, the State of Texas "claim" against DSI; and at the Monahans site, the State of Texas "claim" against DSI, the EPA suit against DSI, and the R & H Wells suit against DSI.[11] Each of these challenged claims or suits is brought against Dowell Schlumberger, Inc. ("DSI"), a 50/50 joint venture formed by Dow and Schlumberger in 1984.

Fireman's Fund's 1956–1970 policies promise that it will indemnify Dow for "all sums which the *insured* shall become *obligated to pay by reason of the liability imposed upon the insured by law,* ... because of injury to or destruction of property." (Emphasis added). Fireman's Fund's 1970–1976 policies similarly promise that it will indemnify Dow for all "sums which the *insured* shall become *legally obligated to pay as damages* because of ... *property damages.*" (Emphasis added). A number of Fireman's Fund's policies with Dow (4/5/61–6/1/64, 1/1/64–1/1/69, and 7/30/70–1/1/74) contain a contract liability endorsement which promises that "[s]uch insurance as is afforded by the policy also applies to any obligation assumed by the *named insured* under any contract arrangement *to defend* any person, firm or organization." (Emphasis added).

Dow's contractual agreements with DSI include a 1984 agreement where Dow and Schlumberger agreed to a 50/50 split for any liabilities arising from operations after the 1984 creation of the joint venture. Dow also expressly retained responsibility for all environmental liability arising from its pre-joint venture operations. Specifically, the 1984 agreement provides that:

Dow will retain the responsibility, liability benefits, established reserves, and insurance coverage as to, and shall defend and retain the handling of, all third party tort,

---

10. Fireman's Fund's (1956–1976) motion is joined by Travelers (1950–1956)/ Aetna (1976–1985), Century (1944–1949), AIG Defendants, First State, Interstate Fire & Casualty, and Nationale–Nederlanden.

11. This Court, in its 12/4/97 Mem. Op. at 29–32, ruled that Fireman's Fund has no duty to defend Dow with respect to suits and claims where Dow is not a named party. The Court ruled that the State of Texas claims against DSI at the Midland and Monahans sites, involving notice of violation letters, were not the functional equivalent of "suits" and thus did not give rise to the duty to defend; and further ruled that Fireman's Fund's policies do not obligate it to defend the suits, such as the Monahans site R & H Wells suit, the Monahans site EPA suit, and the Brookhurst site State of Wyoming suit, which were brought against parties other than Dow; the named insured.

product or services liability, environmental ... and similar claims, lawsuits or similar liabilities, known or unknown, *by or against Dow* that arise out of Dow's conduct of the Dowell Business to the extent such claims, lawsuits and similar liabilities arise out of occurrences taking place on or before [April 13, 1984]. (Emphasis added). Dow Motion, Ex. A at § 3.02. In 1988, Dow and Schlumberger agreed to allocate responsibility for certain environmental liabilities. Under this agreement, liabilities were apportioned between Dow, the former owner of the Dowell business, and its successor DSI, based on the number of years that each company had owned the sites in question. This allocation generally resulted in an 80–Dow/20–DSI split. Dow Motion, Schindler Aff. ¶ 8 and Ex. B. Finally, in 1993, Dow sold its remaining interest in the former Dowell business to Schlumberger. In that 1993 agreement, the parties allocated environmental liabilities based upon the existing condition of the former Dowell sites, the relative time period for which each party had been involved in operations at the sites, and the historical contamination at each site. Dow Motion, Schindler Aff. ¶¶ 9–10.

Fireman's Fund argues here that: (1) if there is no duty to defend, as this Court has previously decided, then there can be no duty to indemnify because the duty to defend is broader than the duty to indemnify; and (2) the contract language at issue here does not require Fireman's Fund to provide indemnity coverage for "potential liability" under strict liability environmental laws that have not been enforced against Dow, the named insured, or for "contractual liability" arising from contracts that did not come into existence until many years after Fireman's Fund's policies had expired.

Dow has filed a cross-motion arguing that: (1) although Dow's status as a party to litigation is arguably relevant to the duty to defend, which applies to "suits against the named insured," it is irrelevant to the insurer's duty to indemnify Dow for its "legal obligations" under strict liability environmental laws, regardless of when, or if, the government or third parties actually seek to enforce those laws against Dow; and (2) Dow is not seeking indemnification for DSI's liabilities nor is Dow merely seeking to recover amounts it contractually agreed to pay under its 1984, 1988 and 1993 agreements with DSI; rather, Dow is seeking indemnification for its own pre-existing liability, arising from its ownership and operation of the Brookhurst, Midland and Monahans sites, that it retained under the 1984, 1988 and 1993 agreements with DSI.

Dow, acknowledging that the Michigan courts have not squarely addressed the question presented here, relies on decisions from other jurisdictions to support its position. In support of its first argument, Dow cites *Weyerhaeuser Co. v. Aetna Cas. & Sur. Co.*, 123 Wash.2d 891, 874 P.2d 142, 145 (1994) (where, despite the lack of a PRP letter or other formal legal action against the insured, the Washington Supreme Court held that an insurer under a CGL insurance policy, "which provides coverage for all sums which the insured shall be obligated to pay by reason of the liability imposed by law for damages on account of property damage, may provide coverage when an insured engages in the cleanup of pollution damages in cooperation with an environmental agency"). *Accord, Bausch & Lomb, Inc. v. Utica Mut. Ins. Co.*, 330 Md. 758, 625 A.2d 1021, 1024 (1993); *Compass Ins. Co. v. Cravens, Dargan & Co.*, 748 P.2d 724, 728 (Wyo.1988). In support of its second argument, Dow cites *Pittston Co. v. Allianz Ins. Co.*, 905 F.Supp. 1279, 1294–95 (D.N.J.1995), *rev'd in part on other grounds*, 124 F.3d 508 (3d Cir.1997) (where the court held that the insured, by retaining legal liability for pre-existing environment damage in a contract where it sells its business, did not "voluntarily" assume another's liability and thus coverage was not barred under the voluntary payment provision).

Dow is correct. The Michigan Supreme Court has not squarely addressed the question presented here. Accordingly, this Court must predict how that Court would rule here and "must ascertain the state law from all relevant data." *Anderson Development Co. v. Travelers Indem. Co.*, 49 F.3d 1128, 1131 (6th Cir.1995) (internal quotes and citations omitted).

The issue presented here is basically one of contract interpretation, and "Michigan's

foremost principle for construing insurance contracts is the maxim that an insurance policy must be enforced in accordance with its terms." *Id.* (internal quotes and citations omitted). "If the contract fails to define a term, the court must interpret the term according to its commonly used meaning, taking into account the reasonable expectations of the parties." *Id.* (internal quotes and citations omitted).

The Fireman's Fund policies at issue here do not define the "legal obligations" phrases emphasized above. Accordingly, this Court must give the policy terms their commonly used meaning and take into account whether, in the context of these CGL policies, the parties reasonably expected that Fireman's Fund would indemnify Dow for cleanup costs incurred in governmental and third-party actions brought against an entity that was not a named insured under the subject policies.

This Court is not persuaded that, given their commonly used meaning and taking into account the parties' reasonable expectations, the subject language would require Fireman's Fund to indemnify Dow for money it paid in lawsuits where it had not been sued and in governmental actions where it had not been named simply because it *could* have been sued and strict liability environmental laws *could* have been enforced against Dow but were not. The Court rejects Dow's reasoning that "because environmental liability is strict, a property owner whose land is polluted becomes, ipso facto, 'legally obligated to pay'" regardless of fact that no one— not the government, DSI or a third-party— has actually sought to enforce those strict liability environmental laws against Dow. *See Ryan v. Royal Ins. Co. of America,* 916 F.2d 731, 742 (1st Cir.1990).[12] Rather, this Court is convinced that the Michigan Supreme Court would construe the "legal obligations" language at issue here to mean more than inchoate or potential liability. "Even though environmental liability may be strict, it is only when the government actually purposes to enforce the law against [an insured] that

the latter will bear the consequences of strict liability." *Id.* Absent the government, or anyone else, seeking to enforce the strict liability laws against Dow, Dow would suffer no consequences under these laws if it failed to pay cleanup costs in response to the challenged actions. Under the facts presented here, Dow's pressure to respond flows from its contractual obligations with DSI; not from any enforcement of strict liability environmental laws. This Court, contrary to Dow's urging, predicts that the Michigan Supreme Court would not require Fireman's Fund to indemnify Dow simply because it was potentially liable for remediation costs under certain statutes even though no one sought to hold Dow liable under those statutes.

The decisions Dow relies upon for support are readily distinguishable. In each, a governmental agency sought to enforce strict liability environmental laws against the insured; not another entity. Moreover, the decisions were driven, in large part, by a policy concern that is not present here; i.e., a contrary decision would delay or discourage the cleanup of surface, groundwater or soil contamination. This point is illustrated in *Weyerhaeuser* where the court observed that it would be improper to force insureds who "would have commenced or continued independent remedial actions to await formal enforcement by the State in order to avoid losing any potential for insurance coverage" because to do so would only create a "disincentive to engage in independent cleanups" and "slow the progress of hazardous waste cleanup." *Id.* at 151. In the challenged actions here, the government or a third party has sought to enforce the strict liability environmental laws against an entity other than the insured; and that entity, DSI, which is also strictly liable under the subject environmental laws, has responded and the cleanup process has not been delayed. Accordingly, the policy concerns underlying these environmental statutes—that a respon-

---

**12.** In *Ryan,* the First Circuit Court of Appeals observed that, while something less than a formal lawsuit against the insured could trigger the insurer's duty to defend, a letter from the New York Department of Environmental Conservation requesting that the insured submit plans for any

proposed remedial action, was not sufficiently adverse or coercive to be considered the functional equivalent of a suit and thus would not give rise to the duty to defend or the duty to indemnify. 916 F.2d at 738–743.

sible party respond quickly to correct environmental damage—are not undermined by this Court's decision.

For the foregoing reasons, this Court GRANTS Fireman's Fund's motion and DENIES Dow's cross-motion on the duty to indemnify with respect to claims in which Dow was not a named party.

### E. Coverage Under Century Indemnity's "Accident" Based Policy

■ Century[13] has moved for summary judgment here arguing that its accident-based insurance policies do not require it to provide indemnification coverage to Dow's claims as to the Cliffs–Dow site. Specifically, Century contends that: (1) under Michigan law, the term "accident" in its accident-based CGL policies is to be construed so as to afford coverage only where property damage is caused by sudden, unintended, and unexpected events; and (2) Dow cannot identify any events that satisfy this definition of "accident" at Cliffs–Dow.[14] Dow responds that Century construes the term "accident" far narrower than Michigan law allows. This Court agrees.

As this Court has previously observed, Century's policies do not define the term "accident." 12/4/97 Mem. Op. at 18. When left undefined, the Michigan Supreme Court has interpreted "accident" as:

anything that begins to be, that happens, *or that is a result* which is not anticipated and is unforeseen and unexpected by the person injured or affected thereby—that is, takes place without the insured's foresight or expectation and without design or intentional causation on his part. In other words, an accident is an undesigned contingency, a casualty, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated, and not naturally to be expected. (Emphasis added).

*Group Ins. Co. of Mich. v. Czopek*, 440 Mich. 590, 597, 489 N.W.2d 444 (1992). The Michigan Supreme Court also requires that, when the insurance contract is silent as to perspective, the term "accident" is to be evaluated from the standpoint of the insured; not the injured party. *Arco Ind. Corp. v. American Motorists Ins. Co.*, 448 Mich. 395, 405, 531 N.W.2d 168 (1995).

In *Frankenmuth Ins. v. Piccard*, 440 Mich. 539, 548–549, 489 N.W.2d 422 (1992), the Michigan Supreme Court rejected the same argument Century raises here; i.e., that intentional acts cannot be considered "accidents" even though they cause unexpected and unintentional harm. The *Piccard* Court observed that "it is possible to have a cause of action where the intentional conduct will result in untended and unexpected injury thus constituting an 'accident' under the policy language." *Id.* This principle was recently reaffirmed in *Arco* where the Court observed that "intentional releases of [contaminants] without an intent to harm the environment does not establish the lack of an 'occurrence' " although occurrence is defined as an "accident" which results in property damage "neither expected nor intended from the standpoint of the insured." *Arco*, 531 N.W.2d at 178, 172–73. As Justice Boyle clarified in her concurring opinion in *Arco*, "the only analysis necessary in this regard is whether the *damages* were intended or expected from the standpoint of the insured. That inquiry sufficiently encompasses the threshold determination of 'accident' as this Court had defined that term." *Id.*, 531 N.W.2d at 179.

In sum, Michigan law does not support Century's argument that intentional acts that cause unintended and unexpected property damage cannot be construed as "accidents." Dow, in response to Century's motion, has come forward with evidence showing that it

---

**13.** "Century" refers to Century Insurance Company, successor to CCI Insurance Company, successor to Insurance Company of North America, successor to Indemnity Insurance Company of North America. The policies issued by the former Indemnity Insurance Company of North America are referred to as the five Century primary policies covering the period from 6/1/44—3/28/49.

**14.** Century's CGL primary accident-based policies promise:

To pay on behalf of the insured all sums which the insured shall become legally obligated to pay by reason of liability for damages because of injury to or destruction of property, including the loss or use thereof, caused by accident.

did not expect or intend to cause the property damage at the Cliffs–Dow site.

 Michigan law likewise does not support Century's argument that the undefined "accident" term in its accident-based CGL policies is to be construed to include a temporal element like that found in the "sudden and accidental" exception to the pollution exclusion. There is no such pollution exclusion in Century's policies, and Michigan law precludes this Court from rewriting the parties' contract to include one. *See Auto Club Ins. Ass'n v. DeLaGarza*, 433 Mich. 208, 214, 444 N.W.2d 803 (1989) (where the Court observed that it is the insurer's responsibility to clearly express limitations on coverage). Accordingly, Century's motion for summary judgment is DENIED.

## III. Conclusion

For the foregoing reasons, this Court: (1) GRANTS Fireman's Fund's motion for partial summary judgment based on the pollution exclusion; (2) GRANTS IN PART AND DENIES IN PART Travelers/Aetna's motion for partial summary judgment based on the pollution exclusion; (3) DENIES Travelers/Aetna's and Dow's cross-motions for partial summary judgment based on the loss-in-progress doctrine; (4) GRANTS IN PART AND DENIES IN PART Travelers' motion for partial summary judgment based on the lack of property damage; (5) GRANTS Fireman's Fund's motion and DENIES Dow's cross motion for partial summary judgment regarding claims and suits where Dow is not a named party; and (6) DENIES Century's motion for summary judgment regarding indemnification coverage under its accident-based policies.

### Appendix A *—Remaining Claims / Primary Insurers

| Site | Years Dow on Site | Remaining Claims / Suit | Remaining Primary Insurers Implicated |
|---|---|---|---|
| Brookhurst ** | 1954–84 | 1] EPA 6/25/87 PRP letter<br>2] EPA 8/14/91 lawsuit<br>3] *Albertson* lawsuit 10/20/89 complaint | Fireman's Fund (11/19/56 –7/30/70) |
| Cliffs–Dow | 1935–68 | 1] State of Michigan MDNR 10/31/91 PRP letter<br>2] *Presque Isle* lawsuit 12/10/93 complaint | Travelers (3/28/50—11/19/56)<br>Zurich (3/28/49—3/28/50)<br>Century (6/1/44—3/28/49)<br>Fireman's Fund (11/19/56—7/30/70) |
| Conalco | 1952–69 | 1986 Conalco demand<br>Dow participate in remediation | Travelers (6/1/54—11/19/56)<br>Fireman's Fund (11/19/56—7/30/70) |
| Daffron & Pinion | 1966— | 1] State of Georgia 4–5/87 notice to Dow re contamination and requiring investigation<br>2] *Daffron & Pinion* lawsuit 10/19/88 complaint | Fireman's Fund (11/19/56—7/30/70) |
| Harris/Farley Street | 1958 | 9/3/82 EPA PRP letter | Fireman's Fund (11/19/56—7/30/70) |
| Hartley & Hartley | 1958–1978 | 1] MDNR, PRP letter 3/1/94<br>2] MDNR lawsuit 6/28/94 complaint<br>3] *Waste Management* lawsuit 6/30/94 complaint | Fireman's Fund (11/19/56—4/1/76)<br>Aetna (4/1/76—4/1/85) |
| Midland | 1952–84 | *Charles White* lawsuit 9/5/91 demand letter 11/26/91 complaint | Travelers (1954—11/19/56)<br>Fireman's Fund (11/19/56—7/30/70) |
| Monahans | | None remaining | |
| PPI | 1964–70 | 1] *Ewell I* lawsuit 10/21/70 complaint<br>2] *Ewell II* lawsuit 7/1/76 complaint<br>3] EPA lawsuit 7/14/80 complaint<br>4] *Jarvis* lawsuit 4/96 complaint | Fireman's Fund (11/19/56—4/1/76)<br>Aetna (4/1/76—4/1/85) |

5] *Canal Develop Corp.* lawsuit
4/96 complaint

Silresim 1971–77 1] Mass. PRP letter 8/22/83 Aetna (4/1/76—4/1/85)
2] Mass. lawsuit 12/9/83 com-
plaint
3] EPA PRP letter 8/22/83
4] EPA demand letter 5/8/89

\* This chart is prepared without regard to the parties' motions for summary judgment as to late notice and voluntary payment provisions.
\* \* Information obtained from parties' time lines.